**Donald Stewart WILSON, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 10S00–9606–CR–432.

Supreme Court of Indiana.

July 17, 1998.

Vicki L. Carmichael, Jefferson, for appellant.

Jeffrey A. Modisett, Attorney General, Randi F. Elfenbaum, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant Donald Stewart Wilson seeks reversal of his convictions on one count of murder, Ind.Code § 35-42-1-1, and two counts of attempted murder, Ind.Code §§ 35-42-1-1 and 35-41-5-1.[1]

Wilson claims that double jeopardy barred his retrial, that the court wrongly refused various instructions on lesser included offenses, and that it erroneously gave an instruction referring to the jury as the "moral conscience of our society." We affirm.

## Statement of Facts

Shortly after midnight on the morning of May 27, 1994, Wilson drove to the Keg Liquor Lounge in Clarksville. His wife, Judith Bowles Wilson (Judy), from whom a divorce was pending, was employed at the Keg and working that night. (R. at 15.) Wilson was aware his wife was seeing someone. (R. at 1467.) While standing outside the Keg, Wilson engaged in a brief conversation with Charles Wise, an employee at the liquor store next to the Keg. Wise recalled Wilson saying, "looks like lover is here tonight." (R. at 1103, 1113.) Wise testified that he knew Wilson was referring to Antonio Rodriguez, Judy's boyfriend, and that Rodriguez was inside the bar. (R. at 1113–14.)

Following that conversation, Wilson walked into the Keg carrying a Ruger .357 Magnum handgun. Wilson observed his estranged wife speaking to Rodriguez, and twice demanded to see her outside. (R. at 1194.) After seeing Rodriguez make some sudden movements, (R. at 1685), Wilson shot at Rodriguez at least once, striking him in the left forearm. (R. at 15, 1196.) As Rodriguez fell to the ground and crawled behind the bar, Judy, who was already behind the bar, ran towards the kitchen. (R. at 15, 1199.) Wilson then turned and fired two shots in Judy's direction. (*Id.*)

Another patron who was in the bar at the time, Jack Bierly, later told police he believed Wilson actually fired two shots at Rodriguez. (R. at 15.) Bierly also observed Wilson raise and aim his gun in the direction of Judy. (R. at 1235.) At that point, Bierly got up and ran out the front door of the bar. He heard more shots fired inside the bar as he ran. (R. at 1236.) Wilson followed Bierly outside. (*Id.*) Bierly heard Wilson yelling at him to stop running. (*Id.*) Bierly testified that he then turned and saw Wilson pointing the .357 Magnum at him. (*Id.*) Bierly drew his own revolver and shot at Wilson five times. (*Id.*) Wilson fired twice in the direction of Bierly, though Wilson contends that the discharges were accidental. (R. at 15; Appellant's Br. at 27.) Bierly was not hit by these shots. Wilson sustained multiple gunshot wounds from Bierly's shots before he fled to the car he had driven, parked in an adjacent lot. (R. at 15.)

Police found Wilson collapsed next to a car in a lot adjoining the Keg. (R. at 14.) He had been shot in the stomach, chest, and right pinky finger. (R. at 1042–1043, 1038.) Inside the lounge, they found Judy Bowles Wilson dead from a gunshot wound to the head. (R. at 15.) A bullet had entered her left temple and exited the back of her skull. (R. at 1064.) Police also found the injured Rodriguez. (R. at 14.)

The police searched the car next to which Wilson had been found. (R. at 916.) The car belonged to an employee of the company where Wilson was a manager. (R. at 910.) Inside the car, they found one of Wilson's business cards. (R. at 930.) They also found a box of .357 caliber ammunition, (R. at 925), a shotgun, (R. at 922), and a box of shotgun shells, (*id.*). None of these items belonged to

---

1. Wilson was also convicted of carrying a handgun without a license, Ind.Code § 35-47-2-1. He does not appeal that conviction.

the owner of the car, nor had he given permission for Wilson to borrow the car or put the guns and ammunition in it. (R. at 911–13.)

Wilson was transported from the scene to the hospital and remained there for surgery and follow-up care. On June 3, police arrested Wilson and charged him with the murder of Judy Bowles Wilson, the attempted murder of Rodriguez and Bierly, and carrying a handgun without a license. (R. at 12–13.)

### I. Wilson's Double Jeopardy Claim

Wilson claims he was subjected to double jeopardy when he was retried following a mistrial. Because the motion for mistrial was necessitated by "prosecutorial misconduct," Wilson says, his retrial should have been barred.

#### A. Events Surrounding Wilson's Mistrial

Before the first trial, the defense moved to suppress all the statements Wilson made on the night of the shooting, including those to investigating detectives in the ambulance and at the hospital. (R. at 43.) This effort was unsuccessful in either trial.

During the course of the first trial, the State questioned Detective Carl Durbin. En route to the hospital, Wilson told Durbin that while he was in the parking lot of the Keg, another male had approached him and shot him. (R. at 323.) The direct examination reads as follows:

A: I asked Mr. Wilson I'd like to talk to him and went ahead and Mirandized him. He did agree that he would talk back to me.

Q: So he could communicate with you, correct?

A: Yes, he could.

Q: And during the course of his, the trip between the scene that he was located and the hospital, did you have the opportunity to discuss this case with Mr. Wilson?

A: Yes, I did.

Q: What did he advise you?

A: Well, in route to Humana Hospital, U of L Hospital, after I Mirandized him, I asked Mr. Wilson what had hap-

pened at the Keg Liquors. He said that he had, he was approached by an unknown male outside of the parking lot at the Keg where he had been shot. The subject stated, Mr. Wilson stated that he did not know the person who had shot him. After that statement, I asked him had there been an argument prior to this, you know, prior to him being shot. He refused to—

[Defense Counsel]: Objection. Could we approach?

(R. at 693–94.)

Wilson objected to Detective Durbin's testimony and subsequently moved for a mistrial. He contended that Durbin's statement "he refused—" violated the holding in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that post-*Miranda* silence may not be used against a defendant. After hearing arguments, the trial court overruled the objection and denied the motion for mistrial. (R. at 713.) The court did, however, tell the prosecutor not to make any further references to Wilson's assertion of *Miranda* rights.

After a brief recess and another witness, the State called Detective Edward McCutcheon to the stand. (R. at 741.) While at the hospital, Wilson told McCutcheon that he had gone to a bar and been ambushed by a stranger. (R. at 350.) The relevant portion of that testimony reads as follows:

Q: Did you at anytime during your investigation meet with a person identified as Donald Wilson?

A: Yes.

Q: When was that?

A: At the University Hospital.

. . . .

Q: During the course of this meeting, what did you personally do?

A: I went to the University Hospital in order to get a statement from Mr. Wilson. I went to Mr. Wilson's room at the University Hospital, and there was a guard posted at his door. I identified myself to the guard at the door, explained to him why I was there, and then went, proceeded into the room to talk to Mr. Wilson.

Q: When you went into the room, describe to the Jury how Mr. Wilson physically appeared.

A: He was sitting in a chair next to his bed reading a book.

Q: What day was this?

A: I don't recall. Several days after the incident.

Q: Okay. Did you then have the opportunity to converse with Mr. Wilson in any way?

A: Yes, I identified myself to him, explained why I was there, and that I would like to take a statement from him, and as I was doing that, he was talking to me. He was asking me who had shot him and if that person was in jail. At that time, I told him that before I could talk to him, I needed him to sign a rights waiver, and I proceeded to get that out of the file, and he continued to talk, and I handed him the rights waiver and asked him to sign it, and at that time, he said that he needed to talk to an attorney, he thought it would be best if he talked to an attorney.

(R. at 788–90.)

Wilson objected, and after the court heard further testimony outside the presence of the jury to clarify Detective McCutcheon's statements, Wilson moved for a mistrial on *Doyle* grounds, that the State may not comment on a defendant's exercise of his right to remain silent.[2] (R. at 791, 793–94.) The court granted Wilson's motion for mistrial and set the cause for retrial. (R. at 795–99.)

Wilson filed a motion to dismiss, claiming double jeopardy. Wilson argued at a hearing, as he argues now, that his retrial should have been barred because his motion for mistrial was necessitated by prosecutorial error and/or misconduct, which was inspired by the State's desire to retry the case and improve its chances of winning. (R. at 143–51, 806–27.) The prosecutor vigorously denied

any intent to create a mistrial through his interrogation of Detective McCutcheon:

I was nine witnesses into my case after I got off this Police Officer, McCutcheon, who this Court has heard testify on numerous occasions. This man was about to throw up on direct. He couldn't even identify pictures of the scene when I was asking him that. This man is scared to death when he testifies. He's a good Officer. I did not in any way attempt, nor would I have any reason to try to seek a mistrial. The day that I can't look the Court in the eye or the Jury in the eye, I have the ability to dismiss the case. I've tried over 300 cases in my career. I have never deliberately tried to mistrial a case.

(R. at 811–13.)

At the close of the hearing, Judge Donahue indicated he did not find any deliberate prosecutorial misconduct, stating:

I don't believe from my standpoint as the 13th Juror listening to the testimony in this particular case that what occurred here was any intention of goading the Defense into moving for a mistrial, to put the Defendant in a position where he was forced to move for a mistrial. I have observed Officer McCutcheon, again, as a trier of fact, many times from this particular bench and I know how awkward he is in testifying, how intimidated he always seems to be when he testifies, particularly, he was intimidated in this instance . . . but I don't think the conduct here was intentional at all. It was not geared to goad the Defense into any kind of position. . . .

(R. at 816–18.) Judge Donahue also entered a number of findings, including:

There is no evidence or inference which would indicate that the State of Indiana benefitted in any manner by the mistrial, or intended in any respect to provoke or cause the mistrial.

(R. at 157.)

On retrial, a jury found Wilson guilty on all four counts charged. The trial court sen-

---

2. *See Doyle*, 426 U.S. at 619, 96 S.Ct. 2240 (holding that exercise of the right to remain silent after a *Miranda* warning has been given cannot be used to impeach a defendant); *Wainwright v. Greenfield*, 474 U.S. 284, 292, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (holding that defen-

dant's post-*Miranda* warning request for an attorney cannot be used as evidence of sanity); *Lynch v. State*, 632 N.E.2d 341, 343–44 (Ind. 1994) (holding that admission of evidence that defendant asked not to be questioned without an attorney was reversible error).

tenced Wilson to sixty years for murder, forty years for each count of attempted murder, and one year for carrying a handgun without a license, all to run concurrently. (R. at 308–309.) This appeal followed.

### B. Analysis of Wilson's Double Jeopardy Claim

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." Similarly, the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Ind. Const. art. I, § 14.[3]

 If a defendant moves for a mistrial, the defendant forfeits the right to raise a double jeopardy claim in subsequent proceedings, unless the motion for mistrial was necessitated by governmental conduct "intended to goad the defendant into moving for a mistrial." *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind.1996) (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)). As *Willoughby* and other cases point out, the key inquiry on appeal concerns the subjective intent of the prosecuting authority. *See United States v. Beasley*, 479 F.2d 1124, 1126–27 (5th Cir. 1973); *Woods v. State*, 484 N.E.2d 3, 5 (Ind. 1985); *Ried v. State*, 610 N.E.2d 275, 279 (Ind.Ct.App.1993). In *Willoughby* we stated, "To determine whether a second trial is barred after a defendant's motion for a mistrial, we must examine whether the prosecutor brought about the mistrial with the intent to cause termination of the trial. If the State acted with intent to force the defendant into moving for a mistrial, the prohibition against double jeopardy bars a second prosecution." 660 N.E.2d 570, 576.

 Wilson urges us to find that the prosecutor's questioning of Detectives Durbin and McCutcheon constituted conduct intended to goad the defense into moving for a mistrial. Our review of the record leads us to the conclusion that the prosecutor did not intend to bring about the mistrial.

We begin by noting that the trial court had refused Wilson's requests to suppress Wilson's statements on the night of the shooting. Thus, it was proper for the prosecutor to be questioning the police officers about the conversations they each had with Wilson following the shooting.

The court overruled the objection to Officer Durbin's statements, but nonetheless warned the prosecutor to proceed carefully to avoid references to Wilson's assertion of *Miranda* rights. When later questioning Detective McCutcheon, the prosecutor asked, "Did you then have the opportunity to converse with Mr. Wilson in any way?" (R. at 790.) In response, Detective McCutcheon began to describe the conversation that occurred, and then mentioned Wilson's request for an attorney. (*Id.*)

The trial court found in its Order that Detective McCutcheon's comments about counsel "were not directly responsive to questions posed by the State." (R. at 157.) Certainly some of what Detective McCutcheon said in response to the prosecutor's question was admissible testimony. The prosecutor's questions, while open-ended, do not appear to us to be solicitations for the detectives to comment on Wilson's request for an attorney, nor do they seem deliberately calculated to create the need for a mistrial.

The cases dealing with the question of prosecutorial intent give significant weight to trial court determinations of whether the prosecutor acted deliberately to cause a mistrial. In *Willoughby*, we noted that "the trial court specifically found that 'the state didn't intentionally cause a mistrial.'" 660 N.E.2d at 576. In *Woods v. State*, this Court also gave weight to the trial court's finding as to the prosecutor's intent. 484 N.E.2d at 6. In *Oregon v. Kennedy*, the U.S. Supreme Court found similar findings of fact not only persuasive but determinative. The Court stated:

> Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in

---

**3.** Wilson makes no particular argument concerning the Indiana Constitution, so we treat his claim as a matter of Fifth Amendment law.

the termination of the first trial was not so intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

456 U.S. at 679, 102 S.Ct. 2083.

The trial court in Wilson's case explicitly found "There is no evidence or inference which would indicate that the State of Indiana ... intended in any respect to provoke or cause the mistrial." (R. at 157.) Though we are inclined to think that such trial court determinations are not conclusive for purposes of state appellate review, we do regard them as very persuasive. The record supports the trial judge's findings that the mistrial was not caused by deliberate conduct on the part of the prosecutor.[4]

Therefore, because retrial is barred only when a prosecutor intends to cause a mistrial, and because the record supports the trial court's conclusion that the prosecutor did not intend to force Wilson to move for a mistrial, we hold that Wilson's retrial did not violate the proscription against double jeopardy. *Willoughby,* 660 N.E.2d at 577.

## II. Wilson's Tendered Instructions on Lesser Included Offenses

At his second trial, Wilson tendered instructions on several lesser included offenses. He now asserts error in the trial court's refusal of some of those tendered instructions.

■ This Court set forth a three-part test for determining when a trial court should instruct on a lesser included offense in the case of *Wright v. State,* 658 N.E.2d 563 (Ind. 1995). Initially, the court must determine whether the lesser offense is either "inherently" or "factually" included in the offense charged. *Id.* at 566–67; *Champlain v. State,* 681 N.E.2d 696, 699 (Ind.1997). If the court concludes that the lesser offense is included in the one charged, then the inquiry hinges on whether a serious evidentiary dispute exists as to which offense was committed by

the defendant, given all the evidence presented by both parties. *Id.*

In this case, the court held a hearing on Wilson's tendered instructions. (R. at 1830.) Wilson argued that he was entitled to the lesser included instructions, as the evidence presented at trial supported the giving of the instructions. (R. at 1846.) The court considered the *Wright* case, and specifically read the case citation into the record. (R. at 1852–53.) The court stated,

Now I've considered the case law submitted by the Defense on these concepts of lesser-included offenses and to be quite frank, I can't see how lesser-included offenses are applicable to this particular case. It comes in two tracks, as you know from reading that particular case, number one, did the State, in drafting its Information, somehow include wording that one could follow that includes Criminal Recklessness and Battery? Now I'm speaking of the attempted murder charges of both Bierly and Rodriguez, does that track, and then secondly, even if it does track, were the facts in the case such that it would justify giving Instructions regarding lesser-included offenses and I find that that's not the case given the evidence in this case. . . .

(R. at 1830–40.)

■ The record indicates that the trial judge did the type of factual analysis contemplated by *Wright* and *Champlain,* and determined that no serious evidentiary dispute existed warranting lesser included offense instructions. Because it is apparent that the court refused the instructions on these grounds, we review his ruling only for an abuse of discretion. *Id.*

### A. Wilson's Voluntary Manslaughter Instructions

■ Wilson tendered a final instruction on voluntary manslaughter. Ind.Code Ann. § 35–42–1–3 (West Supp.1997). The trial court rejected this instruction. Voluntary

---

4. At the hearing on the motion to dismiss on the grounds of double jeopardy, Wilson's own defense counsel did not even argue that the mistrial was intentionally caused by the prosecutor. There, the defense stated, "We're not saying that it was deliberate misconduct or deliberate bad faith on the part of the Prosecutor," (R. at 810), and "we're not saying it was bad faith but it was error nonetheless," (R. at 814).

manslaughter is a lesser included offense of murder. *O'Conner v. State,* 272 Ind. 460, 465, 399 N.E.2d 364, 368 (1980). Both offenses require proof of identical elements: knowingly or intentionally killing another human being. *Anderson v. State,* 681 N.E.2d 703, 710 (Ind.1997). The offense of voluntary manslaughter differs from murder in that it involves the mitigating factor of sudden heat. *Id.* In other words, "Sudden heat is a mitigating factor in conduct that would otherwise be murder." *Estes v. State,* 451 N.E.2d 313, 314 (Ind.1983). Because voluntary manslaughter is an inherently included offense to murder, step one of the *Wright* test is satisfied, and we thus turn to step three, the serious evidentiary dispute. *Wright,* 658 N.E.2d at 567. It is at this stage that Wilson fails.

■ We find no evidence supporting the claim of sudden heat. Sudden heat is "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary man; it prevents deliberation and premeditation, excludes malice, and renders a person incapable of cool reflection." *McBroom v. State,* 530 N.E.2d 725, 728 (Ind.1988).

■ Wilson correctly contends that the record indicates he was angry about the relationship his wife was having. (Appellant's Br. at 20.) Anger standing alone is not sufficient to support an instruction on sudden heat. *Matheney v. State,* 583 N.E.2d 1202, 1205 (Ind.1992). Wilson says that actually seeing his wife with her boyfriend Rodriguez at the bar enraged him to the level of sudden heat. (Appellant's Br. at 20.) Wilson further argues that the reason such an observation angered him to the level of sudden heat was because he suffered from Post–Traumatic Stress Disorder, which caused flashbacks during stressful situations. Therein lies the rub. Wilson contends that he suffers from an emotional disorder which causes him to react to stressful situations more harshly than other people react to those situations, such that he is not the ordinary man referred to in the definition of sudden heat adopted by this Court. An otherwise normally stressful encounter does not suddenly inflame sudden heat, mitigating murder, simply because a

person suffers from a psychological disorder which gives him a "hair trigger."

The record belies Wilson's argument that he acted under sudden heat. As noted above, Wilson knew about Judy's relationship with Rodriguez. At least four days before the shooting, Wilson had a conversation with Judy's brother, Donald O'Brien, in which he told O'Brien that if he ever caught Judy with her boyfriend, he would kill them. (R. at 1468.) Also before the shooting, Wilson engaged in several conversations with a former employee of his named Samuel Dryden. (R. at 1443–44.) Dryden testified at trial that during the course of those conversations, Wilson stated that in our criminal justice system, "it was pretty easy to get out of things," (*id.*), and "if it ever came down to it and he'd killed somebody, he would use the Vietnam flashback syndrome," (*id.*). Finally, the weapons and ammunition found in the car Wilson had taken without permission cuts against a finding of sudden heat. (R. at 910–30.)

Considered cumulatively, this evidence showed a degree of premeditation sufficient to sustain the trial court's determination that no serious evidentiary dispute existed on sudden heat. The court properly refused Wilson's tendered instructions on voluntary manslaughter.

### B. Wilson's Reckless Homicide Instructions

■ Wilson tendered an instruction on reckless homicide, Ind.Code Ann. § 35–42–1–5 (West 1986). The only distinguishing feature in the elements of murder and reckless homicide is the mens rea required of each offense. *Wright,* 658 N.E.2d at 567. Reckless homicide is an inherently included offense of murder. *Id.* at 567. We thus turn again to step three of the *Wright* analysis.

■ Under step three, Wilson argues, based solely on his assertion of the insanity defense, that his intent was in dispute. (Appellant's Br. at 22.) We find Wilson's argument misplaced. This Court has held that

a trial court does not err when it refuses to instruct the jury as to a lesser-included offense in a prosecution for murder where

the defense of insanity is used to disprove intent to commit the greater offense, and thus would not be compatible with the inference of guilt of a lesser-included offense.

*Matheney v. State*, 583 N.E.2d 1202, 1206 (Ind.1992) (citing *Rowe v. State*, 539 N.E.2d 474, 477 (Ind.1989)). While Wilson would be entitled to a lesser included instruction if a serious evidentiary dispute existed about the level of his mens rea, his interposition of the insanity offense does not by itself raise such a dispute.

Any dispute raised by the insanity defense concerns whether a defendant had any culpable intent at all. The "serious evidentiary dispute" called for by *Wright* is a dispute over *which* offense a defendant may have committed, the lesser or the greater. Because a successful insanity defense would make Wilson nonculpable for any offenses he may have committed, the insanity defense cannot be the mechanism to demonstrate dispute entitling him to a lesser included instruction. *See Gonzales v. State*, 642 N.E.2d 216, 216–17 (Ind.1994); *Matheney*, 583 N.E.2d at 1206; *Rowe*, 539 N.E.2d at 477. Because the insanity defense is the sole cause proffered by Wilson as to why a serious evidentiary dispute existed between murder and reckless homicide, and that argument is misplaced, we conclude the trial court correctly refused Wilson's instructions on reckless homicide.[5]

### C. Wilson's Battery Instructions

 With regard to Count II, the attempted murder of Rodriguez, Wilson tendered instructions on battery. The trial court rejected them. Battery may be a lesser included offense of attempted murder if the charging information alleges a factual physical transgression against the victim so as to satisfy the "touching" element of battery. *Leon v. State*, 525 N.E.2d 331, 332

(Ind.1988). The charging information in the present case reads:

> DONALD STEWART WILSON did attempt to commit the crime of Murder, to-wit: Knowingly or intentionally killing another human being, and did so by knowingly or intentionally pointing and firing a Ruger .357 Magnum handgun at the person of Antonio Rodriguez, *striking him in his left forearm*, said conduct constituting a substantial step toward commission of the crime of Murder upon Antonio Rodriguez, all with the intent to kill Antonio Rodriguez.

(R. at 12 (emphasis added).) The charge clearly alleges a touching of Rodriguez, and so battery is a lesser included offense in this instance. The question thus becomes whether the evidence warrants an instruction on the lesser included offense, or whether there is "serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense, and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater.…" *Wright*, 658 N.E.2d at 567.

 Again, the distinguishing element between battery and attempted murder is intent. *Compare* Ind.Code Ann. §§ 35–41–1–1, 35–42–5–1 (West Supp.1997) *with* Ind. Code Ann. § 35–42–2–1 (West Supp.1997). Wilson contends that one reason his intent was in dispute was his assertion of the insanity defense. This argument fails for reasons we described above. Wilson argues further, however, that evidence was presented calling into question whether his intent was to kill or simply to batter Rodriguez. (Appellant's Br. at 27.) We thus examine the evidence to see if "there is a serious evidentiary dispute about what [Wilson] intended to do—kill or batter." *Lynch v. State*, 571 N.E.2d 537, 539 (Ind.1991).

 Our review of the record reveals no evidence that Wilson intended only to wound Rodriguez, other than his assertions

---

5. On the issue of Wilson's tendered reckless homicide instruction, because the sole cause of dispute proffered to us by Wilson on whether he intended to commit murder or reckless homicide was his insanity defense, our analysis on that particular issue actually does end with *Matheney* and *Rowe*. Because we acknowledge a defen-

dant's right to make alternative defenses, however, and we find that Wilson did so, we must look at the evidence presented by both parties and perform the full analysis set forth in *Wright* to resolve Wilson's claims on other tendered instructions.

to that effect. To the contrary, this Court has repeatedly stated that the use of a deadly weapon in a manner likely to cause death or great bodily harm is sufficient to show the requisite intent to kill. *See, e.g., Shelton v. State,* 602 N.E.2d 1017, 1022 (Ind.1992); *Elliott v. State,* 528 N.E.2d 87, 89 (Ind.1988). Wilson shot a .357 Magnum handgun at Rodriguez from across the bar. (R. at 15.) Such an act constitutes the "use of a deadly weapon in a manner likely to cause death or great bodily harm." *Harper,* 523 N.E.2d at 1391. Wilson's assertion that when he pointed and fired a .357 Magnum handgun at Rodriguez from across a bar he intended only a "rude touching," defies credulity. Ind.Code Ann. § 35–42–2–1 (West Supp.1997); *cf., Lynch,* 571 N.E.2d at 539 (Shepard, C.J., dissenting). The trial court did not abuse its discretion when it refused the instructions.

### D. Wilson's Attempted Battery Instructions

Wilson tendered instructions on attempted battery for Count III, the attempted murder of Bierly, which the trial court rejected. Indiana courts have not yet addressed the issue of whether attempted battery may be a lesser included offense of attempted murder. We now conclude that it may be a factually included offense under the second step of *Wright.*[6]

■ Indiana's murder statute states that a person commits murder when he "[k]nowingly or intentionally kills another human being." Ind.Code Ann. § 35–42–1–1 (West Supp.1997). The battery statute states that a person commits battery when he "knowingly or intentionally touches someone in a rude, insolent, or angry manner...." Ind.Code Ann. § 35–42–2–1 (West Supp 1997). Our attempt statute reads: "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step towards commission of the

crime." Ind.Code Ann. § 35–41–5–1 (West 1986).

■ We have previously held that battery is a lesser included offense of attempted murder when the charging instrument alleges a touching. *Leon,* 525 N.E.2d at 332. Similarly, attempted battery may be a lesser included offense of attempted murder when the charge reveals an attempted touching, as was the case here. The charging instrument here alleged:

> DONALD STEWART WILSON did attempt to commit the crime of Murder, to-wit: Knowingly or intentionally killing another human being, and did so by knowingly or intentionally *pointing and firing a Ruger .357 Magnum handgun at the person of Jack W. Bierly II,* said conduct constituting a substantial step toward commission of the crime of Murder....

(R. at 12 (emphasis added).) Therefore, we conclude that when there is an attempted touching alleged, attempted battery is a lesser included offense of attempted murder. In such cases, the analysis hinges on whether a substantial evidentiary dispute exists as to whether a defendant tried to kill or batter. Wilson's arguments about why he was entitled to instructions on attempted battery fail at this stage.

■ Other than pointing to his insanity defense, Wilson highlights his argument that the gun discharged accidentally after being struck by a bullet fired by Bierly as support for a serious evidentiary dispute. As with the insanity defense, however, a contention of accidental discharge seeks to rebut any and all intent on the part of Wilson either to kill or batter Bierly. The dispute contemplated by *Wright* concerns *which* offense Wilson intended to commit, attempted murder or attempted battery. Accordingly, we find no serious evidentiary dispute raised by Wilson's contention of accidental discharge.

---

**6.** Our decision that attempted battery may be a lesser included offense of attempted murder may allow defendants like Wilson to satisfy the second prong of the *Wright* test, and thus get them to the third. That may not ultimately be beneficial to defendants like Wilson, however, as it seems unlikely that trial courts will conclude that such

a defendant is entitled to an instruction on attempted battery under *Wright*'s step three. To do so, a trial court would have to conclude that a serious evidentiary dispute existed as to whether a defendant attempted to kill or simply commit a "rude touching" when the defendant fired a handgun at someone from a short distance.

■ Wilson's final contention about attempted battery amounts to: even if he did fire the gun at Bierly intentionally, he did not intend to kill him. (Appellant's Br. at 27.) According to the probable cause affidavit and the testimony of Jack Bierly, Wilson shot Bierly with a .357 at a distance between ten and twenty-five feet. (R. at 15, 1236.) Given the evidence, the trial court did not abuse its discretion when it determined that no serious evidentiary dispute existed from which "a jury could conclude that the lesser offense was committed but not the greater." *Wright*, 658 N.E.2d at 567.

### E. Wilson's Criminal Recklessness Instructions

■ Wilson tendered instructions on criminal recklessness as a lesser included offense of the attempted murders, Counts II and III. The trial court rejected the instructions. Indiana courts have repeatedly held that criminal recklessness is not an inherently lesser included offense of attempted murder. *Goolsby v. State*, 517 N.E.2d 54, 62 (Ind.1987); *Flowers v. State*, 481 N.E.2d 100, 104 (Ind.1985). Further, as stated above, Count II of the charging instrument in this case read:

DONALD STEWART WILSON did attempt to commit the crime of Murder, to-wit: Knowingly or intentionally killing another human being, and did so by knowingly or intentionally pointing and firing a Ruger .357 Magnum handgun at the person of Antonio Rodriguez, striking him in his left forearm, said conduct constituting a substantial step toward commission of the crime of Murder upon Antonio Rodriguez, all with the intent to kill Antonio Rodriguez.

(R. at 12.) Count III of the charging instrument mirrored Count II of the charging instrument in all relevant respects. (*See id.*) As this Court has previously stated in a similar situation, "[i]t is clear that no element of reckless behavior was included in this charge." *See Humes v. State*, 426 N.E.2d 379, 382 (Ind.1981).[7] According to *Wright*, "If the alleged lesser included offense is neither *inherently* nor *factually* included in the crime charged, then the trial court should not give a requested instruction on the alleged lesser included offense." 658 N.E.2d at 567. Therefore, trial court properly refused Wilson's tendered instructions on criminal recklessness.

### III. The "Moral Conscience of Our Society" Instruction

The trial court accepted and gave the following instruction tendered by the State:

You are instructed that in doing your duty as a juror you may call upon all of your experiences in life in determining the evidence. There is nothing mysterious or fanciful about the criminal justice system in this country and it is presumed that you, the jury, will not check your common sense at the Courtroom door but will use such common sense in determining the guilt or innocence of the Defendant herein.

You are further instructed that in determining the criminal responsibility of the Defendant, if any, that you are *the moral conscience of our society* and must take into account all of the facts and circumstances in this case in order to determine the Defendant's guilt or innocence.

(R. at 193 (emphasis added).) Wilson objected to this instruction and now claims error on the grounds that the instruction was "an unconstitutional appeal to the community conscience." (R. at 1844; Appellant's Br. at 31.)

This Court specifically approved a similar instruction in *Cox v. State*, 475 N.E.2d 664, 668–69 (Ind.1985).[8] Wilson concedes our ex-

---

7. In *Humes*, the charging instrument read:
 On or about the 13th day of December [ ... ] Humes did attempt to commit the crime of murder by knowingly and intentionally shooting a loaded firearm at and against the body of Jerry Shake, which conduct constituted a substantial step toward the commission of said crime of murder[.]
 426 N.E.2d at 382.

8. The instruction at issue in *Cox* read: "You are further instructed that in determining the criminal responsibility of the Defendant herein, if any, that you are the moral conscience of our society and must take into account all the facts and circumstances in this case to determine the Defendant's guilt or innocence." 475 N.E.2d at 668. The Court found that this instruction comported with our notions of what "the law"

plicit approval of such an instruction, but urges us to reconsider our previous ruling in light of our decision in *Griffin v. State,* 644 N.E.2d 561 (Ind.1994).

In *Griffin,* we disapproved the further use of an instruction telling the jury that a defendant should not be "acquitted erroneously" because "[b]y acquittal of the guilty, a contempt of the law is aroused among the criminal classes and the safeguards of society are weakened." 644 N.E.2d at 564. The Court disapproved future use of the instruction "because it risks distracting the jury by its speculation on the sociological impact of erroneous verdicts." *Id.* The instruction at issue here hardly runs that risk. Instead, it reminds jurors of their special role in the system of justice using language we employ even in the most serious cases of all. *Roark v. State,* 644 N.E.2d 565, 570 (Ind.1994) (stating that the jury's recommendation in capital cases represents the "conscience of the community").

In light of *Cox* and *Roark,* we hold that the trial court properly overruled Wilson's objection to the instruction.

### Conclusion

For the aforementioned reasons, we affirm.

DICKSON, SULLIVAN, SELBY, and BOEHM, JJ., concur.

means, and amounted to nothing more than a general admonition to the jury to do its duty. *Id.* at 669.