# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 10 2019, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rebecca Lawson, | July 10, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 18A-CR-2425 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Marc T. Rothenberg, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 49G02-1602-MR-6182 |

**Altice, Judge.**

## Case Summary

[1] Following a jury trial, Rebecca Lawson was convicted of murder, a felony, and attempted murder, a Level 1 felony, and was sentenced to an aggregate term of eighty-five years of imprisonment. Lawson presents two issues for our review:

> 1. Did the trial court abuse its discretion in refusing her tendered jury instruction on self-defense?

> 2. Did the trial court abuse its discretion in refusing to instruct the jury on battery with a deadly weapon as a lesser included offense of attempted murder?

[2] We affirm.

## Facts & Procedural History

[3] Patrick Brown and Cecelia Land met in 2014 and began dating. Early in their relationship, Land noted that Brown had Lawson's contact information saved on his phone, and Brown explained that Lawson was a coworker. At that time, Brown did not tell Land that he had a prior romantic relationship with Lawson. Late one night, Lawson called Brown's phone and Land answered. When Lawson asked for Brown, Land told her that he was outside and identified herself as Brown's girlfriend. She then gave the phone to Brown, who got mad and threw the phone, refusing to speak with Lawson.

[4] In October or November 2014, Land and her children moved into Brown's home in Indianapolis. At some point, Brown told Land about his romantic history with Lawson. Shortly after Land moved in, she saw that Lawson was calling Brown again. Land answered a call Lawson made to Brown's phone

and informed Lawson that she and Brown were "living together" and that "my children are here and if you don't quit, I'm going to kick your [ass]." *Transcript Vol. 2* at 40. Land never spoke to Lawson again.

[5] Brown and Land lived together until December 2015, when Land ended the relationship and moved out. In February 2016, Brown contacted Land and the two reconnected. Land agreed to bring her children over to Brown's home to eat pizza and play games.

[6] Brown was expecting Land and her children to come to his house during the evening of February 12, 2016. Earlier that day, Brown and Lawson exchanged text messages. At 1:30 p.m., Lawson texted Brown "How's your day going babe?" *Exhibits* at 182. Brown responded about forty minutes later with one word: "Cold." *Id*. Lawson replied, "I'm waiting to see doc and get results" and Brown responded, "Fun." *Id*. At 2:12 p.m., Lawson messaged Brown, "want to see you today if I can." *Id*. Brown did not respond.

[7] About three hours later, at 5:14 p.m., Lawson texted Brown again and asked if he was on his way home from work. Brown immediately responded "not yet" and asked Lawson "what's up". *Id*. Lawson responded, "seeing if I could come over and if you wanted dinner." *Id*. At 5:16 p.m., Brown texted Lawson that he would be at work for awhile and would let her know when he got home.

[8] Meanwhile, Land and her daughters arrived at Brown's home around 6:00 p.m. At 6:26 p.m., Lawson sent Brown a text message with a question mark. At 6:44 p.m., Brown responded, "still at work". *Id*. at 183. Lawson immediately

replied, "WTF tell them bye". *Id.* When Brown did not respond, Lawson called him at 7:13 p.m. Four minutes later, Brown texted Lawson, "I will let u know f*ck". *Id.* At 7:25 p.m., Lawson texted back, "Whatever. I'm being nice and you been a dick for a week. I don't know what your problem is but I didn't do anything to deserve f*cking attitude for wanting to see you and spend time with you". *Id.* Brown did not respond. At 7:44 p.m., Lawson sent another text message, "yes no". *Id.* Again, Brown did not respond. At 7:55 and 8:03 p.m., Lawson called Brown, but he did not answer either call.

Lawson decided "something was up" so she drove to Brown's house. *Id.* at 194. When she saw Brown's truck and Land's car parked in the driveway, she pulled in. Brown came out and told her to leave. Lawson then drove to a Walgreens about a mile away and parked in the parking lot. At 8:11 p.m. Lawson texted Brown, "get her gone now" and "I'm waiting at Walgreens". *Id.* at 183. She called Brown's phone, but he did not answer. At 8:15 p.m., Lawson texted, "I'll come back. You need to respond". *Id.* Four minutes later, Lawson called Brown again and when he did not answer, she sent another message, "This isn't a joke!" *Id.* Lawson continued sending messages to Brown and calling his phone, but he did not respond or answer. At 8:28 p.m. Lawson texted, "she gone????" and then proceeded to call Brown ten times in rapid succession. *Id.* At 8:35 p.m., Lawson texted Brown, "This isn't a f*ckng game. Answer me!!!" *Id.* She called again at 8:36 p.m. Finally, at 8:37 p.m., Lawson texted, "You know what f*ck it. You made your choice. I'm

coming there getting my . . . gun and everything I dropped off with it and you can keep her." *Id*. at 184.

[10] Lawson parked in Brown's driveway and then pulled a loaded handgun from her purse and put it on her lap. Brown came outside and again told her to leave. Lawson refused to leave until Brown returned a revolver that she had loaned to him.

[11] In the meantime, Land opened the front door of the residence and asked Brown if he was alright. Brown yelled at Land to go back inside, and she complied. A few seconds later, believing that something was wrong, Land went outside and started walking toward the car. Land did not know who was in the car, but heard the occupant yelling at her that she "ha[d] a gun and a gun permit." *Transcript Vol. 2* at 44. Land responded that she "didn't give a sh*t." *Id*. at 54.

[12] Land stopped in front of the car and heard Brown tell the driver to leave. Land started to realize what was going on and who was in the car. She started cursing at Brown and Lawson, and as she turned around to walk away, she heard Brown yell, "leave my property now, Becca, leave now." *Id*. She also saw Brown reaching toward the driver's window, which was partially open. Moments later, Lawson shot Brown in the chest and he fell to the ground. According to Lawson, Land was moving closer with her hands up in front of her chest and holding something in one hand.[1] Lawson "swung her arm over

---

[1] The object in Land's hand was later determined to be a cell phone.

and pointed towards [Land] and . . . shot" twice. *Exhibits* at 208. Land was shot in the jaw and between the eyes. Lawson dropped her gun on the front seat of her car as she got out to tend to Brown. She then called 911 and told the operator that she "just shot two people." *Id*. at 209.

[13] Land's teenage daughter who was inside Brown's house heard "a couple of loud noises" that she thought "was just the paintball gun." *Transcript Vol. 2* at 62. She then went outside to investigate. She did not see anyone, but heard Brown yelling "call 911, find your mom." *Id*. at 63. It was "really dark outside," but as she looked around, she saw a woman standing over Brown and her mother lying on the ground and bleeding from her face. *Id*. at 63. She immediately called 911. Lawson never asked about Land's condition.

[14] Officer John Montgomery of the Indianapolis Metropolitan Police Department (IMPD), along with other IMPD officers, were dispatched at 8:47 p.m. in response to the 911 calls. When Officer Montgomery arrived at the scene he observed a light-colored SUV with its headlights on sitting in the driveway. Lawson was with Brown, who was unconscious and had a faint pulse. Land was lying on the ground and bleeding heavily from her head. Officer Montgomery asked for the identity of the shooter, and Lawson admitted, "I shot them." *Id*. at 87. Lawson cooperated with Officer Montgomery as he placed her in handcuffs and turned her over to another officer to remove her from the scene. No weapons were found on or near Brown or Land.

[15] Brown was pronounced dead shortly thereafter. Land ultimately survived her injuries. She regained consciousness twelve days after the shooting. She underwent two surgeries to remove the bullets from her head, and her right eye was replaced with a prosthetic.

[16] Lawson waived her *Miranda* rights and was interviewed by police later that night. Lawson told police that Brown demanded she leave his property, but that she refused until he returned her gun that she had left with him. Lawson also claimed that Brown saw the gun in her lap and that he reached into her car and tried to grab it. According to Lawson, she pulled the gun away and yelled, "don't touch my gun", and Brown responded back, yelling, "I'll rip that mother f*cker out of your hand." *Exhibits* at 204. As Lawson screamed at Brown to give her the gun she left with him, Brown reached through the open driver's window and squeezed her chin and cheeks with one hand and told her to "shut the f*ck up", which is when she fired her gun in Brown's direction. *Id.* at 205.

[17] Police questioned Lawson about why she did not just leave Brown's property, and Lawson explained, "[t]hey were standing that close to the car I was in park and I had my gun in my hand and where my shifter is I would . . . there was no way for me to shift." *Id.* When asked if she could have put the gun down in order to shift her car, she said "probably." *Id.* She admitted that she had multiple opportunities to put the gun down and drive away.

[18] On February 17, 2016, the State charged Lawson with murder, a felony, and attempted murder, a Level 1 felony. Lawson's first jury trial was held on

January 9-11, 2017. The jury found her guilty on both counts, and the trial court subsequently sentenced her to consecutive terms of fifty-five years and thirty years respectively. Lawson appealed, and in a memorandum decision, this court reversed her convictions and remanded for a new trial. *Lawson v. State*, 49A02-1703-CR-445 (Ind. Ct. App. Nov. 20, 2017) (concluding that trial court's failure to instruct jury on self-defense denied Lawson fundamental due process and made a fair trial impossible).

[19] Lawson was retried on August 27-29, 2018. At trial, Lawson requested that the jury be instructed to the effect that she did not give up her right to self-defense by trespassing, which instruction the trial court refused. Lawson also requested that the trial court instruct the jury on voluntary manslaughter as a lesser included offense of murder, and Level 5 felony battery with a deadly weapon as a lesser included offense of attempted murder. The trial court granted Lawson's request with regard to the voluntary manslaughter instruction but refused to give the battery with a deadly weapon instruction. At the conclusion of the trial, the jury found Lawson guilty of murder and attempted murder. Lawson now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. Self-Defense Instruction

[20] We review a trial court's decision to give or refuse a tendered instruction for an abuse of discretion. *Matheny v. State*, 983 N.E.2d 672, 679 (Ind. Ct. App. 2013), *trans. denied*. In reviewing a trial court's decision, "we consider (1) whether the

instruction correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions." *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010). A defendant is entitled to a reversal if she affirmatively demonstrates that the instructional error prejudiced her substantial rights. *Buckner v. State*, 857 N.E.2d 1011, 1015 (Ind. Ct. App. 2006).

[21] In addition to the pattern jury instruction for self-defense, Lawson requested that the jury be instructed that "a person does not give up her right to self-defense by trespassing. An alleged trespasser may still use force against a landowner when acting in self-defense." *Transcript Vol. 2* at 235. As support for this instruction, Lawson directed the trial court to *Lemon v. State*, 868 N.E.2d 1190 (Ind. Ct. App. 2007). During discussion with the court regarding the proposed instruction, Lawson indicated that she wanted the jury to be instructed with this language from *Lemon*:

> The simple act of trespass, without the threat of imminent violence or destruction of property, or actual violence or destruction of property on the part of the trespasser, does not sanction the use of unreasonable force by a landowner or his agent to terminate the trespass. Furthermore, an alleged trespasser does not give up her/his common law and statutory right to resist the use of unreasonable force by a landowner or her/his agent.

868 N.E.2d at 1197. The State responded that such an instruction would confuse the jury and that it was not supported by the facts. The trial court reviewed the *Lemon* case and concluded that Lawson's proposed instruction

was not applicable because Lawson was not an alleged trespasser and she did not engage in the simple act of trespass without the threat of imminent violence. The court also determined that Lawson's proposed instruction would have confused/mislead the jury. The court, however, permitted Lawson to quote some of the language from *Lemon* during closing argument.

[22]    It has been long held that the "mere fact that certain language or expression [is] used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to a jury." *Keller v. State*, 47 N.E.3d 1205, 1209 (Ind. 2016) (quoting *Ludy v. State*, 784 N.E.2d 459, 462 (Ind. 2003)). The Supreme Court explained that "[a]ppellate review of the sufficiency of the evidence . . . will 'rarely, if ever,' be an appropriate basis for a jury instruction, because the determination is fundamentally different." *Id.*

[23]    The issue addressed by the court in *Lemon* was a challenge to the sufficiency of the evidence, and the result turned on the court's conclusion that the evidence did not support a finding that the defendant committed breach of the peace and thus, there was no authority to effectuate a citizen's arrest. The language Lawson selected for her proposed instruction summarized the *Lemon* court's holding regarding the unique issues and claims presented therein under the lens of a sufficiency-of-the-evidence analysis. The circumstances in the present case are not even remotely similar to the unusual scenario presented in *Lemon*. Lawson's proposed instruction containing the language from *Lemon* was not warranted in this case.

[24] We also agree that Lawson's proposed instruction would have served only to confuse and/or mislead the jury as to the issues involved in the case. Lawson's proposed instruction would have introduced the concept of trespassing into the self-defense analysis without defining that term.

## 2. Battery with a Deadly Weapon

[25] Lawson argues that the trial court abused its discretion in refusing her lesser included offense instruction for Level 5 felony battery with a deadly weapon. When called upon by a party to instruct a jury on a lesser included offense of the crime charged, a trial court must perform a three-step analysis. First, it must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine if the alleged lesser included offense is inherently included in the crime charged. *Wright v. State,* 658 N.E.2d 563, 566 (Ind. 1995). Second, if a trial court determines that an alleged lesser included offense is not inherently included in the crime charged under step one, then it must determine if the alleged lesser included offense is factually included in the crime charged. *Id*. at 567. If the alleged lesser included offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser included offense. *Id*. Third, if a trial court has determined that an alleged lesser included offense is either inherently or factually included in the crime charged, it must look at the evidence presented in the case by both parties to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater

from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater. *Id*.

[26] Where the trial court makes an express finding that there is no serious evidentiary dispute, the court's decision is reviewed for an abuse of discretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998). Here, the trial court found that there was a lack of a serious evidentiary dispute. We will therefore review the trial court's refusal to give the instruction on battery by means of a deadly weapon for an abuse of discretion.

[27] Battery with a deadly weapon is not an inherently included offense of attempted murder. *See Leon v. State*, 525 N.E.2d 331, 331 (Ind. 1988) (holding that "[b]ecause it is possible to attempt murder without touching the intended victim, battery is not inherently a lesser included offense of attempted murder). Battery, however, may be a lesser included offense of attempted murder if the charging information alleges a factual physical transgression against the victim so as to satisfy the touching element of battery. *Wilson v. State*, 697 N.E.2d 466, 475 (Ind. 1998). The charging information in the present case provided:

> On or about February 12, 2016, REBECCA LAWSON did attempt to commit the crime of Murder, which is to intentionally kill another human being, namely: Cecelia Land, by engaging in conduct, that is: shooting a deadly weapon, that is: a handgun, at and against the person of Cecelia Land, with the specific intent to kill Cecelia Land, which conduct constituted a substantial step toward the commission of said crime of Murder.

*Appellant's Appendix Vol. II* at 27. The parties agree that given the charging information, battery with a deadly weapon is a factually included offense of attempted murder. *See Johnson v. State*, 464 N.E.2d 1309 (Ind. 1984) (holding that battery was factually included in charged offense of attempted murder where charging information alleged the defendant knowingly or intentionally shot a round of live ammunition at the victim from a pistol and that the round of ammunition struck and wounded the victim); *Stringer v. State*, 690 N.E.2d 788, 790 (Ind. Ct. App. 1998) (holding that battery was a factually included lesser offense of attempted murder because defendant was charged with "knowingly shooting at and against the body of" the victim).

[28] Under the *Wright* test, however, an instruction permitting a verdict for a lesser included offense is appropriate only if there is a serious evidentiary dispute regarding Lawson's *mens rea*, as this is the distinguishing element between battery with a deadly weapon and the charge of attempted murder. *See Wilson*, 697 N.E.2d at 475 (noting that the distinguishing element between battery and attempted murder is intent).

[29] In *Wilson*, the defendant was convicted of attempted murder and other offenses, and he appealed the trial court's rejection of his tendered jury instruction identifying battery as a lesser included offense of attempted murder. The defendant argued that the circumstances of his shooting a gun across a bar in the direction of his soon-to-be-ex-wife's boyfriend and striking him in the arm called into question whether he intended to kill or simply batter his victim. The Supreme Court found no evidence that Wilson intended only to wound his

victim, stating "this Court has repeatedly stated that the use of a deadly weapon in a manner likely to cause death or great bodily harm is sufficient to show the requisite intent to kill." *Id*. at 476. The Court concluded that Wilson's act of shooting a handgun at his victim from across the bar constituted "use of a deadly weapon in a manner likely to cause death or great bodily harm." *Id*. (quoting *Harper v. State*, 523 N.E.2d 1389,1391 (Ind. 1988)). The Court further concluded that Wilson's claim that he intended only a "rude touching" when he pointed and fired the firearm at his victim "defies credulity." *Id*. Accordingly, the Court held that the trial court did not abuse its discretion in refusing Wilson's tendered battery instruction.

[30] We reach the same conclusion. Here, Lawson had minutes earlier warned Land that she had a gun. Lawson was also clearly upset that Land was at Brown's home. After shooting Brown in the chest, Lawson pointed her handgun at Land and fired, striking Land two times in the face. Based on these facts, there was no serious evidentiary dispute regarding Lawson's intent in shooting Land. Thus, the trial court did not abuse its discretion in refusing Lawson's tendered instruction on the lesser included offense of battery with a deadly weapon.

[31] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.