**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**EUGENE C. HOLLANDER**
Special Assistant to the State Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| DEREK F. WILLIAMS, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 14A01-1205-CR-201 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE DAVIESS SUPERIOR COURT
The Honorable Dean A. Sobecki, Judge
Cause No. 14D01-1102-MR-141

**March 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Derek F. Williams appeals from his conviction of and sentence for murder.[1] Williams presents the following issues for our review:

1. Did the trial court abuse its discretion by refusing to instruct the jury on voluntary manslaughter as a lesser-included offense of murder?

2. Is Williams's sentence inappropriate in light of the nature of the offense and the character of the offender?

We affirm.

The facts most favorable to the jury's verdict reveal that Williams and the victim, Kim Williams, were married in 1995 and two children were born of the marriage. T.W. was born in 1997, and R.W. was born in 2004. After serving in the military, Williams began working for a company that installed electronic warfare equipment on military ships located all over the world.

On January 18, 2012, Kim spoke with her attorney, Meredith McIntyre. McIntyre observed that Kim was physically shaking, had tears in her eyes, and was clearly upset. Kim allowed McIntyre to listen to several cell phone messages she had received from Williams and stated that she wanted to commence dissolution proceedings. Near the end of January 2011, Williams, who was working in Hawaii, learned that Kim had filed a petition for the dissolution of their marriage.

Williams told his work supervisor, Scott Greenan about his concern that the divorce would result in Williams losing some of his retirement money. The week of Kim's death, Williams had several conversations with Greenan about the financial aspects of the divorce.

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current through 2012 2nd Reg. Sess.).

Greenan observed that Williams seemed bothered quite a bit and was upset about the matter. Their discussions centered around the topic of how the retirement money could be divided. Ultimately, Greenan told Williams that he should hire an attorney.

Williams also discussed the topic his impending dissolution with Kevin Chase, a co-worker. Williams told Chase that he was upset about losing some of his retirement money and asked Chase, who had previously been divorced, about divorce attorneys. Chase indicated that he had been represented by McIntyre in his dissolution action. When Williams told Chase that Kim had hired McIntyre, Chase responded by saying, "[Y]ou're screwed." *Transcript* at 559. Chase responded the same way on the few occasions Williams discussed the issue with him, and made that statement on the day Kim died. One day after work, Williams told Chase that it would "just be easier to kill the bitch." *Id*. at 560.

On the evening of February 3, 2011, T.W. and Kim watched several television shows together while R.W. was already asleep in bed. At approximately, 8:40 p.m., Williams came home and went to his office in the family's home. T.W. went to bed sometime between 9:00 p.m. and 9:30 p.m. At approximately, 12:40 a.m., T.W. awoke to hear his mother screaming and crying, in a manner which he had never before heard, and which was indicative of the fact that she was in a great deal of pain. T.W. heard Kim ask "Why are you doing this?" *Transcript* at 317. Williams responded in an angry voice, "Does that hurt?" *Id*. T.W. arose from bed to use the bathroom and then returned to his bed. A few minutes after lying back down, T.W. heard the sound of four gunshots.

T.W. got out of bed, turned on the lights, and walked to the area between the living room and the kitchen. He observed his mother's motionless body on the floor next to the fireplace and could tell that she had been shot. Williams was rolling around on the floor and it appeared to T.W. that Williams had shot himself. T.W. cursed at his father and asked him why he would do something like that. He then ran to the kitchen, and grabbed Kim's phone. On his way back to his bedroom, T.W. encountered R.W. in the hallway. R.W. asked T.W. why he was yelling. T.W. placed R.W. in his room and dialed 911.

Daviess County Sheriff's Deputy Mark Bledsoe was dispatched to Williams's home, and after arriving at the house, looked for any signs of light. The dispatcher had advised him that the children were scared and wanted to know when it would be safe to come out. Deputy Bledsoe asked the dispatcher to inquire if T.W. could unlock the front door. The dispatcher advised Deputy Bledsoe that the boy was scared and did not want to come to the door. When Deputy Horace Wise arrived at the Williams home, Deputy Bledsoe told him he was going to kick in the front door. Deputy Bledsoe announced himself and stated that he was coming in the house. Before he could enter the house, he saw someone walking in the living room area. Deputy Bledsoe relayed that information to Deputy Wise who looked into the house from another window. Deputy Wise saw an individual who appeared to be bloody. Deputy Bledsoe observed that the person seemed to be frantically searching for something.

Deputy Bledsoe knocked on the door again and announced that he was with the sheriff's department. Deputy Wise informed Deputy Bledsoe that the individual in the house had run downstairs and returned. He also observed that the person was covered in blood.

Deputy Bledsoe knocked and announced his presence again before attempting to kick in the door. The third time Deputy Bledsoe kicked the door, it flew open. He entered, drew his sidearm, and used a small flashlight to scan the interior of the house. Williams suddenly appeared in front of the deputy, and Deputy Bledsoe observed that Williams was covered in blood and looked as if his face was coming apart. Williams assumed a shooter's stance and yelled, "Bang!" *Transcript* at 227. Williams then disappeared before reappearing and engaging in the same behavior. Williams then approached Deputy Bledsoe at a rapid pace and grabbed him. During the ensuing struggle, Deputy Bledsoe attempted to subdue Williams and prevent him from grabbing the sidearm. With Deputy Wise's help, Deputy Bledsoe was able to restrain Williams.

Deputy Bledsoe asked Williams, "Who did this?" *Transcript* at 236. Williams motioned toward the living room and responded, "Ask her." *Id*. Deputy Bledsoe observed Kim's body for the first time when he looked in the direction indicated by Williams. Kim was bleeding from her face. Deputy Bledsoe then asked Williams where the gun was located. Williams again responded, "Ask her." *Transcript* at 237. The left sleeve of Deputy Bledsoe's coat and his left boot were covered in blood from the struggle with Williams.

When the emergency medical technicians arrived, Deputy Bledsoe and Deputy Wise searched the house for the children. They directed T.W. and R.W. to exit the house through a bedroom window instead of the front door, so the children could avoid further exposure to what had taken place in the living room.

5

During the ensuing police investigation, Williams's Glock handgun was found in the living room and divorce papers were found in the passenger seat of Williams's car. A forensic DNA analyst from the Indiana State Police Department determined that the blood and DNA found at the scene belonged to Williams and Kim. A bullet retrieved from the ceiling rafters had Williams's DNA on it from passing through his face when he was shot. A Naval Criminal Investigative Service Special Agent, who worked as a forensic consultant on the case, concluded that Kim was lying down when she was shot.

Investigators discovered that Williams had worked as a reserve sheriff's deputy from 1993 to 1994, and had received specialized training on the use of the firearm that was used to kill Kim. An Indiana State Police forensic firearms examiner tested the murder weapon and found that it was working properly, and concluded that it required six to seven and a half pounds of pressure applied to the trigger in order for the weapon to fire.

During the forensic pathologist's examination of Kim, he found that she had sustained four gunshot wounds, including two wounds to her face as well as gunshot wounds on her arm. The pathologist concluded from the location of the wounds that Kim had been shot first in the arm while she was in a defensive position, and that when the bullet exited her arm, it struck her face. That bullet then entered Kim's brain, leaving her incapacitated and unable to take any conscious action. Kim was then shot again in the face from less than a foot away. The pathologist concluded that Kim died as a result of a gunshot to her face, which caused the bullet to pass through her brain.

The State charged Williams with murder on February 22, 2011. After evidence was presented, Williams requested that the jury be instructed on voluntary manslaughter. The trial court heard the argument of counsel on the issue and denied Williams's request. At the conclusion of the jury trial, Williams was found guilty of murder. Williams's version of the events that occurred on the evening of Kim's death is included in the pre-sentence investigation report, which, obviously, was not before the jury. Williams claimed that Kim awakened him to talk about the divorce and that she had a gun in her hand. He contended that they scuffled for the gun and the gun went off when he had it in his hand with his finger on the trigger. He further claimed that the gun may have gone off from the impact of their struggle. Williams stated that he woke up and discovered that he had been wounded.

The trial court found the following mitigating circumstances: 1) Williams's lack of criminal history; 2) his military record; 3) his employment record; 4) the health and age of his mother; and 5) his volunteer service. The following aggravating circumstances were found by the trial court: 1) Williams's position of trust with the victim; 2) the murder took place in the presence of T.W. and R.W.; 3) Williams's actions exposed T.W., in particular, to a great deal of trauma; 4) Kim was shot more than one time; 5) Williams attempted to orphan his children by shooting himself; and 6) Williams wrestled with police officers who were dispatched to the scene. After concluding that the aggravating factors outweighed the mitigating factors, the trial court sentenced Williams to sixty-five years executed. Williams now appeals.

7

1.

Williams contends that the trial court erred by denying his request that the jury receive

an instruction on a lesser-included offense, voluntary manslaughter. Our standard of review

in matters such as this is well settled.

> To resolve an appellate claim of trial court error in refusing an instruction, we
> consider: (1) whether the tendered instruction is a correct statement of the law;
> (2) whether there is evidence in the record to support the instruction; and (3)
> whether the substance of the instruction is covered by other instructions given
> by the court. When evaluating these factors, we are mindful that instructing
> the jury generally lies within the sole discretion of the trial court and that
> reversal is appropriate only for abuse of discretion.

*Raess v. Doescher*, 883 N.E.2d 790, 798–99 (Ind. 2008) (internal citations omitted). Even

where a trial court errs in giving or refusing to give a tendered instruction, the defendant is

entitled to reversal only if he or she affirmatively shows that the error prejudiced his or her

substantial rights. *Mateo v. State*, 981 N.E.2d 59 (Ind. Ct. App. 2012), *trans. denied*. "Errors

in the giving or refusing of instructions are harmless where a conviction is clearly sustained

by the evidence and the jury could not properly have found otherwise." *Lee v. State*, 964

N.E.2d 859, 862–63 (Ind. Ct. App. 2012) (quoting *Dill v. State*, 741 N.E.2d 1230, 1233 (Ind.

2001)).

> When a party requests a trial court to instruct a jury on a lesser included
> offense of a charged crime, the court must perform a three part analysis. First,
> it must determine whether the alleged lesser included offense is inherently
> included in the greater offense. An offense is inherently included if (a) the
> alleged lesser included offense may be established by proof of the same
> material elements or less than all the material elements defining the crime
> charged, or (b) the only feature distinguishing the alleged lesser included
> offense from the crime charged is that a lesser culpability is required to
> establish the commission of the lesser offense. Second, if an offense is not
> inherently included, then the court must determine whether the offense is

8

factually included by comparing the charging instrument to the statute defining the alleged lesser included offense.

Third, if an offense is either inherently or factually included within a greater offense, then the court must look at the evidence presented in the case by both parties and determine whether there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense. If there is such a dispute, such that a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. If the evidence does not so support the giving of a requested instruction on an inherently or factually included lesser offense, then a trial court should not give the requested instruction. When the propriety of giving a lesser included offense instruction turns on the existence or not of a serious evidentiary dispute, and the trial court has made an express finding on the existence or lack of such a dispute, our standard of review for a lesser included offense instruction is abuse of discretion. If a trial court makes no explicit finding regarding a serious evidentiary dispute, we review the ruling de novo.

*True v. State*, 954 N.E.2d 1105, 1108 (Ind. Ct. App. 2011) (internal quotations and citations omitted).

In the present case, when the parties presented their arguments about the propriety of instructing the jury on voluntary manslaughter, the trial court correctly found that it should turn to the third part of the analysis regarding the tendered instruction.[2] As the statutes are currently drafted, the offense of voluntary manslaughter as a class B felony is an inherently lesser-included offense of murder. *Ross v. State*, 877 N.E.2d 829 (Ind. Ct. App. 2007). The offense of voluntary manslaughter as a class A felony requires the State to prove the additional element that the crime was committed by use of a deadly weapon. *Id.* Thus,

---

[2] The trial court found that voluntary manslaughter was an inherently lesser-included offense of murder, when in this case, it was a factually lesser-included offense of murder. This misstatement does not negate the ultimate conclusion reached by the trial court.

9

voluntary manslaughter, as a class A felony, can be a *factually* lesser-included offense of murder if the charging instrument alleges that the accused used a deadly weapon to commit the offense. *Id.* (emphasis supplied). Here, there is no dispute that Williams was accused of committing the offense by use of a deadly weapon. Thus, in this situation, class A felony voluntary manslaughter would be a factually lesser-included offense of murder. Nonetheless, the trial court turned to the third consideration in its analysis of the appropriateness of giving the tendered instruction, and that analysis would be proper in the case of either a factually or inherently lesser-included offense.

The element distinguishing voluntary manslaughter from murder is sudden heat. I.C. §35-42-1-3 (West, Westlaw current through 2012 2nd Reg. Sess.); *Washington v. State*, 808 N.E.2d 617 (Ind. 2004). Our Supreme Court has characterized sudden heat as an evidentiary predicate allowing for the mitigation of a murder charge to voluntary manslaughter. *Washington v. State*, 808 N.E.2d 617. The evidence indicative of the existence of sudden heat is "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary man; it prevents deliberation and premeditation, excludes malice, and renders a person incapable of cool reflection." *Wilson v. State*, 697 N.E.2d 466, 474 (Ind. 1998) (quoting *McBroom v. State*, 530 N.E.2d 725, 728 (Ind. 1988)).

The trial court analyzed whether there was a serious evidentiary dispute over the existence of sudden heat, the element distinguishing the two offenses at issue here. In its analysis, the trial court noted the conversation to which Chase testified between Williams and Chase about Williams's impending divorce from Kim. In particular, the trial court noted

10

Chase's testimony that Williams indicated "it would just be easier to kill the bitch." *Transcript* at 560. The trial court then analyzed T.W.'s testimony about the sequence of the events on the night of Kim's murder and concluded that there was no serious evidentiary dispute concerning sudden heat. The trial court explicitly rejected that tendered instruction. *Transcript* at 670.

On appeal, Williams claims that the trial court abused its discretion by refusing to give the tendered instruction on voluntary manslaughter. Williams appears to argue that the State's detailed description of the evidence to the jury was compelled by some sudden heat evidence that had been introduced, albeit through its own witnesses, as the defense rested without calling any witnesses after the State had rested its case. Our focus on review of the issue presented, however, is not on the abundance of evidence presented in an effort to establish Williams's guilt, but on the existence of evidence of sudden heat in order to evaluate the trial court's ruling on the tendered instruction.

Williams seems to argue that evidence of sudden heat was introduced through T.W.'s testimony regarding the argument he overheard between Kim and Williams prior to the shooting. T.W. testified that he awoke from sleep to the sound of Kim screaming and crying in a manner he had not heard before that evening. He described her tone as one of someone who was in a great deal of pain. T.W. testified that he heard Kim ask, "Why are you doing this?" and heard Williams respond in an angry tone, "Does that hurt?" T.W. went to the restroom and then returned to his bedroom. He testified that approximately two minutes later

11

he heard three gunshots fired in rapid succession, followed by a pause, and then another gunshot.

Although T.W. testified that on the night of Kim's death Williams was angry and that his parents were involved in an argument resulting in the infliction of pain upon Kim, anger alone is not sufficient to support an instruction on sudden heat. *See Wilson v. State*, 697 N.E.2d 466, 474 (Ind. 1998) (standing alone, anger is not sufficient to support an instruction on sudden heat). Indeed, words alone will not "'constitute sufficient provocation to warrant a jury instruction on voluntary manslaughter[.]'" *Suprenant v. State*, 925 N.E.2d 1280, 1282 (Ind. Ct. App. 2010) (quoting *Allen v. State*, 716 N.E.2d 449, 452 (Ind. 1999)). Furthermore, "[a] mere expression of one[']s desire to end a relationship cannot, as a matter of law, constitute sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection sufficient to warrant a voluntary manslaughter instruction." *Massey v. State*, 955 N.E.2d 247, 257 (Ind. Ct. App. 2011) (citing and comparing *Perigo v. State*, 541 N.E.2d 936 (Ind. 1989) and *Evans v. State*, 727 N.E.2d 1072 (Ind. 2000)).

Here, the record reflects that Williams learned while he was working in Hawaii that Kim intended to begin dissolution proceedings. Williams told his work supervisor, Greenan, about his concern that the divorce would result in Williams losing some of his retirement money. The week of Kim's death, Williams had several conversations with Greenan about the financial aspects of the divorce. Greenan observed that Williams seemed bothered quite a bit and was upset about the matter. Williams also had discussions about the matter with his co-worker, Chase, and the last conversation concluded with Williams's statement, "it would

12

just be easier to kill the bitch." *Transcript* at 560. These conversations occurred several days prior to the evening of Kim's death. Williams signed for the dissolution petition, which arrived by certified mail on the Monday prior to Kim's death on Friday. The trial court correctly concluded that there was no evidence to support giving the tendered instruction. The trial court would have committed reversible error had it given the instruction. *See Watts v. State*, 885 N.E.2d 1228 (Ind. 2008) (it is reversible error to give a voluntary manslaughter instruction where there is no evidence of sudden heat).

2.

Williams also claims that his sixty-five year executed sentence is inappropriate in light of the nature of the offense and the character of the offender. We have the constitutional authority to revise a sentence if, after careful consideration of the trial court's decision, we conclude the sentence is inappropriate in light of the nature of the offense and character of the offender. *See* Ind. Appellate Rule 7(B); *Anglemyer v. State*, 868 N.E.2d 482 (Ind.2007), *clarified on reh'g*, 875 N.E.2d 218. Even if a trial court follows the appropriate procedure in arriving at its sentence, we maintain the constitutional power to revise a sentence we find inappropriate. *Hope v. State*, 834 N.E.2d 713 (Ind. Ct. App. 2005). Although we are not required under App. R. 7(B) to be "extremely" deferential to a trial court's sentencing decision, we recognize the unique perspective a trial court brings to such determinations. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). On appeal, Williams bears the burden of persuading us that his sentence is inappropriate. *Rutherford v. State*, 866 N.E.2d 867.

Turning to the nature of the offense, prior to killing Kim, Williams caused her to experience pain such that she screamed and cried. Kim was killed while in a defensive position, trying to protect herself. After Kim was wounded in a manner that left her incapacitated, Williams fired another shot at her, this time in the face at close range. The crime was committed in the family home and while Williams was aware that his two sons were present. Williams has failed to carry his burden of establishing that the sentence is inappropriate in regard to the nature of the offense.

Turning to the character of the offender, the trial court took into consideration and explicitly found that Williams's military record, employment history, and lack of criminal record were mitigating circumstances. The trial court also took into consideration, however, the fact that Williams violated his position of trust with Kim by killing her in the family's home, and did so with her children present. Indeed, T.W. heard his mother's screams of pain and saw her lifeless body in the living room of the family's home. Williams attempted to orphan his children by shooting himself after murdering their mother. Williams attacked Deputy Bledsoe and engaged in a struggle with him, after Deputy Bledsoe gained entry into the house. Williams has failed to carry his burden of establishing that his sentence is inappropriate in this regard as well.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.