**Herman Ruffin MORRISON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 45A05–9108–CR–274.

Court of Appeals of Indiana, Fifth District.

March 16, 1992.

Nathaniel Ruff, Appellate Public Defender, Crown Point, for appellant-defendant.

Linley E. Pearson, Atty. Gen. of Indiana and Richard C. Webster, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

A jury that was instructed on both murder[1] and voluntary manslaughter[2] found Herman Morrison guilty of murder. Morrison argues in this direct appeal that reversible error occurred because (1) the voluntary manslaughter instruction incorrectly informed the jury that the prosecution has the burden of proof on sudden heat, the statutory factor that mitigates a killing that would otherwise be murder, (2) the error was fundamental, and therefore not waived by defense counsel's failure to object to the instruction, and (3) that failure to object amounted to ineffective assistance of counsel.

The State "concede[s] that the instruction mis-states [sic] the elements [of voluntary manslaughter] by adding sudden heat as an element to be proven by the State." Appellee's Brief at 12. However, the State provides four reasons why the murder conviction should be affirmed, restated as: (1) the prosecutor's objection to the voluntary manslaughter instruction should have been sustained, because the evidence excluded the possibility of a conviction thereof, (2) because the instruction should not have been given, any error in its content was harmless, (3) assuming the evidence warranted the instruction, its incorrect content was not fundamental error, and therefore the defense's failure to object to the instruction waived appellate review, and (4) defense counsel was not ineffective because failure to object to the instruction was a tactical decision.

■ The instruction at the center of this case, final instruction # 6, without question identified sudden heat as an element of voluntary manslaughter to be proven by the prosecution.[3] Therefore, as the State concedes, the instruction misstated the law, for "[s]udden heat is not an element of voluntary manslaughter, but rather a mitigating factor in conduct that would otherwise be murder." *Palmer v. State* (1981), Ind., 425 N.E.2d 640, 644 ("*Palmer I*").

*Palmer I* explains the procedural fundamentals of sudden heat and voluntary manslaughter: the voluntary manslaughter statute sets out a sudden heat affirmative defense to the charge of murder; sudden heat differs from self-defense in that the latter is a complete defense (if accepted by the factfinder), whereas sudden heat merely mitigates murderous conduct to voluntary manslaughter; when evidence of sudden heat is introduced, the State must negate the evidence beyond a reasonable doubt before a conviction for murder may be had. 425 N.E.2d at 644. Evidence of sudden heat may be introduced through the State's evidence, or the defendant's, or both. *Id.* The State may seek to negate the evidence of sudden heat during its case-in-chief, or through rebuttal of the defendant's evidence. *Id.; accord Wolfe v. State* (1981), Ind., 426 N.E.2d 647, 650–53;

---

1. Ind.Code 35–42–1–1.

2. I.C. 35–42–1–3.

3. The instruction, which appears to have been supplied by the trial judge, begins with a verbatim rendition of I.C. 35–42–1–3, the voluntary manslaughter statute, then guides the jury's application of the statute to the evidence and the burden of proof:

 INSTRUCTION NO. 6
 The crime of Voluntary Manslaughter is defined by statute as follows:
 (a) "A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.
 (b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter."

 To convict the defendant, the State must have proved each of the following elements:
 The defendant:
 1. knowingly or intentionally
 2. killed
 3. another human being
 4. by means of a deadly weapon, and
 5. that the defendant did the killing while acting under sudden heat.
 If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty of voluntary manslaughter.
 If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of voluntary manslaughter, a Class A felony.
 Record at 38. This instruction was followed by one defining sudden heat and another explaining that sudden heat must be the result of adequate provocation.

*see also Finch v. State* (1987), Ind., 510 N.E.2d 673.[4]

In *Palmer I*, a jury that had been instructed on both murder and voluntary manslaughter chose murder. On direct appeal, the defendant argued that because sudden heat is an element of voluntary manslaughter, then by implication an absence of sudden heat is an element of murder, and the defendant's murder conviction should be reversed because the State had not proven an absence of sudden heat. The supreme court pointed out the faulty premises of the argument by explaining the fundamentals set out in the preceding paragraph, then affirmed the murder conviction on alternate grounds: there was sufficient evidence for the jury to have concluded beyond a reasonable doubt the defendant was not acting under sudden heat when he shot the victim, or, the jury could have concluded that the defendant's homicidal response was disproportionate to the victim's provocation. 425 N.E.2d at 645.

The *Palmer I* opinion reproduced verbatim the jury instruction on voluntary manslaughter, which stated that the "essential elements" of voluntary manslaughter were the voluntary killing of a human being, without malice, and in a sudden heat. *Id.* at 644. The supreme court "note[d] in passing that the absence of malice is not an element of voluntary manslaughter." *Id.* However, the supreme court offered no comment on the erroneous statement in the instruction that sudden heat is an element of voluntary manslaughter, despite the unequivocal teaching earlier in the opinion that "[s]udden heat is not an element of voluntary manslaughter...." *Id.*

That silence generated post-conviction litigation, with the defendant arguing that the instruction's treatment of sudden heat as an element of voluntary manslaughter

was reversible error. This court agreed in a split decision reported as *Palmer v. State* (1990), Ind.App., 553 N.E.2d 1256, *reh'g denied* ("*Palmer II*"). One judge deemed the instruction a fundamental error, and therefore considered the issue not waived despite not having been argued in the direct appeal, *Palmer I*, and opined that trial counsel had been ineffective for not having objected to the instruction and that appellate counsel had been ineffective for omitting the issue from *Palmer I*. A second judge thought ineffective assistance of counsel required reversal, but thought the instruction not a fundamental error.

On transfer, the supreme court vacated *Palmer II* in *Palmer v. State* (1990), Ind., 563 N.E.2d 601 ("*Palmer III*"), splitting three to two. The majority noted the instruction on voluntary manslaughter was a pattern jury instruction, then assumed for the sake of argument that the instruction was incorrect, but, after sketching the facts on sudden heat, concluded "[u]nder the circumstances, we cannot say that appellant suffered any disservice by the giving of the instruction and the manner in which it was handled by his trial counsel." *Id.* at 604. The *Palmer III* majority added that the error "was readily available on the original appeal and not a proper subject for post-conviction relief." *Id.* The two dissenters in *Palmer III* found "the jury was presented with the evidentiary predicate for the conclusion that appellant was guilty of voluntary manslaughter and not murder[,]" and thought "the failure of counsel to seek a correct and proper instruction on voluntary manslaughter, where a conviction of that lesser offense was actively sought in argument to the jury as an alternative to the self-defense claim, constituted ineffective representation warranting a grant of post-conviction relief." 563 N.E.2d at 605 (DeBruler, J., dissenting).[5]

---

4. The difference in culpability between murder and voluntary manslaughter is expressed in a reduced presumptive sentence: forty years for the former, I.C. 35–50–2–3(a); either ten or thirty years for the latter, depending on whether a deadly weapon was used, I.C. 35–42–1–3(a) and 35–50–2–4, –5.

5. The evidentiary predicate for sudden heat " 'included testimony that the victim, Charles

Williams, had beaten and raped Palmer's sister-in-law, had demanded that the sister-in-law accompany Williams to a liquor store although she did not wish to go, had refused to leave when asked by Palmer to do so, had taunted Palmer, and had appeared to reach for a gun.' " *Palmer III*, 563 N.E.2d at 605 (DeBruler, J., dissenting) (quoting *Palmer II*, 553 N.E.2d at 1261).

Seven months after *Palmer III* was handed down, it was in effect vacated on rehearing in *Palmer v. State* (1991), Ind., 573 N.E.2d 880 ("*Palmer IV*"), by a vote of four to one.[6] *Palmer IV* affirmed *Palmer II*, and held the instruction was erroneous in regard to both absence of malice and sudden heat, that trial counsel was ineffective for failing to object to the instruction, and that appellate counsel was ineffective for not raising the issue on appeal.

Morrison contends instruction # 6 was reversible error, and that defense counsel rendered ineffective assistance by not objecting to it. We turn first to the claim of ineffective assistance of counsel. To prevail on this argument, Morrison must show that counsel's performance was deficient, and that the substandard representation prejudiced the result. *Lawrence v. State* (1984), Ind., 464 N.E.2d 1291.

 In regard to the performance prong, in the context of counsel's failing to object to an instruction stating the prosecution must prove sudden heat before there can be a conviction for voluntary manslaughter, it was argued throughout the *Palmer* post-conviction cases that acquiescence in such an instruction was a tactical choice, insulated from censure. *See, e.g., Palmer II*, 553 N.E.2d at 1259–60; *Palmer III*, 563 N.E.2d at 604. However, in light of *Palmer IV*, it appears that where sudden heat as a mitigating factor was a primary theory of the defense, not objecting to such an instruction is *per se* deficient performance. Accordingly, our focus here is not on the performance prong of ineffective assistance, but on the prejudice prong. Morrison carries the burden to "affirmatively prove he was prejudiced by his counsel's conduct by showing there is a reasonable probability that, but for the unprofessional errors, the result of the proceedings would have been different." *Lawrence*, 464 N.E.2d at 1294. Appellate review under the prejudice prong is thus fact-sensitive, and the reviewing court

"must consider the totality of the evidence...." *Id.*

 "Sudden heat is anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary man; it prevents deliberation and premeditation, excludes malice, and renders a person incapable of cool reflection." *McBroom v. State* (1988), Ind., 530 N.E.2d 725, 728. Tersely, sudden heat is "sufficient provocation to induce such passion to render the defendant incapable of cool reflection." *Fox v. State* (1987), Ind., 506 N.E.2d 1090, 1097. Both the existence of sudden heat and negation thereof by the prosecution are questions of fact committed to the jury. *Id.* Questions of sudden heat and the adequacy of provocation are judged by an objective, "ordinary man" standard. *Harrington v. State* (1992), Ind., 584 N.E.2d 558, 563.

 "[A]ny appreciable evidence of sudden heat justifies [the giving of] an instruction on voluntary manslaughter." *Underwood v. State* (1989), Ind., 535 N.E.2d 118, 120. But, as a matter of law, words alone cannot generate sudden heat. *Perigo v. State* (1989), Ind., 541 N.E.2d 936. And, evidence that the defendant was "angry" does not, standing alone, show sudden heat; there must be evidence that the victim provoked the defendant. *See Matheney v. State* (1992), Ind., 583 N.E.2d 1202, 1205 (evidence of anger but not of provocation is insufficient); *cf. Wright v. State* (1985), Ind., 474 N.E.2d 89, 92, *reh'g denied* (instruction on attempted voluntary manslaughter warranted where defendant was "extremely angry" from belief that victim had planned to burgle defendant's apartment; defendant and victim engaged in heated argument culminating in shooting); *see also Van Orden v. State* (1984), Ind., 469 N.E.2d 1153, 1159–60, *reh'g denied, cert. denied,* (1985), 471 U.S. 1104, 105 S.Ct. 2335, 85 L.Ed.2d 851 (approving instruction that it must be victim who provoked defendant). Moreover, the "heat" must be "sudden"—evidence of the mitigating factor can be negated by a showing

---

**6.** In that seven month interim, one member of the *Palmer III* majority left the supreme court, and was replaced by a Justice of a different

mind on the issue. The fourth vote resulted from a change of mind by a Justice who had voted with the majority in *Palmer III.*

that a sufficient "cooling off period" elapsed between the provocation and the homicide. *See Isom v. State* (1986), Ind., 501 N.E.2d 1074, 1075.

 Here, it was undisputed that Morrison shot to death one Sim Dinkins, in a parking lot adjacent to the clubhouse of the UFO motorcycle club in Hammond, on September 10, 1988. Morrison admitted this from the witness stand. He testified he was not a member of the UFO club, but that he knew some of its members, and had been in their clubhouse on several occasions. On the morning of September 10, he drove his car to the parking lot next to the UFO clubhouse, giving a ride to a woman known to him as "Squirrel." After dropping her off, he tried to leave, but his car wouldn't start. He opened the hood to find the malfunction, which turned out to be a loose battery cable. While so engaged, he felt the need to relieve himself, so he walked to the shelter of two semi-trucks parked nearby and urinated.

As he returned to his car, he was accosted by Dinkins, the UFO club president, who expressed his anger that Morrison had urinated in public rather than in the clubhouse bathroom. Morrison knew Dinkins; there was bad blood between them. Some months earlier, in the UFO clubhouse, Morrison had spilled a beer on Dinkins, who reacted by hitting Morrison in the head with a pool cue. Sometime thereafter, they had agreed to a truce, but Dinkins in time initiated new enmity, once bumping his truck into Morrison's car, and once pushing Morrison when the two encountered each other at Hammond City Hall.

According to Morrison, Dinkins then entered the clubhouse, and Morrison returned to his car. Next, Dinkins came out of the clubhouse armed with a revolver, which he stuck in Morrison's face, while demanding to know whether Morrison's purpose in going to his car was to get a gun. Morrison told Dinkins that he was only going for a screwdriver to fix his battery cable. When asked whether he said anything to Dinkins, Morrison answered "I didn't say nothing.... Just kept working on my car. Once I showed him the screwdriver he looked at me and mumbled and walked off." Record at 379.

Morrison explained that he then walked to a friend's nearby house to solicit help with his repair. The friend supplied a wrench and accompanied Morrison back to the clubhouse. They fixed the battery cable. Morrison drove away by himself. He went around the block, stopped, opened his trunk, and removed a shotgun therefrom. He then walked back to the UFO clubhouse, and holding the shotgun pointed downward, towards his leg, approached Dinkins in the parking lot, "asked him why he always kept messing with me" and "told him I didn't appreciate him putting no gun in my face" and that he "just wanted him to leave me alone and quit harassing me and carrying on." Record at 377.

Morrison testified that he had no intention of shooting Dinkins, but returning with a shotgun and confronting Dinkins was the only way he could figure to bring about an end to Dinkins's harassment. In any event, the two stared at each other silently until Morrison sought to depart, backing away from Dinkins. Morrison looked over his shoulder to see whether any UFO members were "trying to sneak up behind [him]." When he looked back at Dinkins, he saw him "going up under his shirt and had his hand on his gun. I shook my head no. He kept going for the gun. I shot him." Record at 378.

Morrison testified that he shot Dinkins three or four times, that he feared for his life when he was shooting, and that he fired more than once because Dinkins kept trying to draw his revolver. Morrison walked away and went into hiding. No revolver was recovered at the scene.

Defense counsel asked Morrison "what would you have done differently about that evening?" He replied "as I sit and think about it now I would try to handle the situation a little bit better than what I did because I guess it was a gesture on my part by me going back and confronting him with a gun, I guess, I reckon." Record at 387.

For the prosecution, the woman known as "Squirrel," one Shirley Garreffa, testi-

fied that she had been vigorously criticizing Morrison for urinating in public, that Dinkins had told Morrison he could have gone in the clubhouse, and that Dinkins was laughing, telling her to stop her tirade against Morrison. Garreffa and two other prosecution witnesses testified that Morrison said nothing to Dinkins before shooting him.

In all this testimony, we do not see an evidentiary predicate for sudden heat sufficient to establish a reasonable probability that but for the erroneous instruction the jury would have convicted Morrison of voluntary manslaughter. Therefore, Morrison has not shown the prejudicial result necessary to prevail on a claim of ineffective assistance of counsel. *Cf. Palmer IV, supra; Palmer III, supra* (dissenting opinion).

Even accepting as true Morrison's testimony that Dinkins stuck a gun in his face, and deeming that a provocative act going beyond mere words, we do not see that Morrison was rendered incapable of cool reflection. Instead, he continued working on his car, walked to a friend's home to borrow a tool, returned to the parking lot, finished his repair, and drove away. Only then did he take up the shotgun. He testified that he returned with no intention of shooting Dinkins, but rather to insist that Dinkins respect him. This is inconsistent with a claim of action under the impulse of sudden heat. Morrison's testimony revealed his return was a calculated choice, even if somewhat hastily decided and in retrospect not the most sensible course in those circumstances. If Morrison had drawn the shotgun from his trunk the instant Dinkins mumbled something and walked away, the existence of sudden heat would have been much more plausible. As it was, Morrison wanted the jury to vindicate his shooting of Dinkins as a justifiable act of self-defense, rather than mitigate it as an act of sudden heat. *Cf. Underwood v. State, supra* (voluntary manslaughter instruction not warranted, despite strong facts for sudden heat, because defendant's "entire defense was that the shooting was entirely accidental....").

We would reach the same result even if counsel had objected to instruction # 6 as an incorrect statement of the law of voluntary manslaughter, and we accordingly were to review this case in terms of trial judge error. "Any error in the giving ... of an instruction is harmless error if the conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." *Cheney v. State* (1985), Ind., 486 N.E.2d 508, 513. In Morrison's case, the jury rejected his testimony of self-defense. Therefore, the conviction for intentionally or knowingly killing a human being, that is, murder, was clearly sustained by the evidence. And, because there was no factual basis for the existence of sudden heat, the jury could not have properly convicted on voluntary manslaughter. *See Hensley v. State* (1986), Ind., 499 N.E.2d 1125, 1127 (where there is no evidence of provocation or sudden heat, an incorrect instruction on attempted voluntary manslaughter provides no basis for reversal of attempted murder conviction).

AFFIRMED.

RUCKER and GARRARD, JJ., concur.