## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 06 2018, 9:05 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Travis Dean Fentress,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

March 6, 2018

Court of Appeals Case No.
31A01-1703-CR-687

Appeal from the Harrison Superior
Court

The Honorable Joseph L.
Claypool, Judge

Trial Court Cause No.
31D01-1601-MR-49

**Brown, Judge.**

[1] Travis Dean Fentress appeals from his convictions for murder and attempted murder. Fentress raises two issues which we revise and restate as:

I. Whether the trial court committed fundamental error in instructing the jury; and

II. Whether the evidence is sufficient to sustain his habitual offender determination.

We affirm Fentress's convictions and habitual offender determination but remand with instructions that the trial court attach his habitual offender enhancement to either his sentence for murder or to his sentence for attempted murder.

*Facts and Procedural History*

[2] Ralph and Rebecca Thomas were married and lived in a house in Palmyra, Indiana. Rebecca had been addicted to methamphetamine and had known Fentress for about one to one and one-half years and had sometimes given Fentress methamphetamine, when on the evening of January 12, 2016, Fentress and Tara, Fentress's girlfriend, stopped at the Thomases' residence, but no one was at home.

[3] On January 13, 2016, Fentress and Tara again visited the Thomases' residence and entered the house, at which time the Thomases, Kyle Day, and Carrie Ule were in the residence, Day was taking a shower, and Rebecca was in her bedroom. Fentress told Day he needed to dress and that "[h]e thought Becca and Ralph tried to give him a hot shot which is bad drugs." Transcript Volume 3 at 52. Fentress held a sawed-off shotgun in his hand which had initially

belonged to Day and which Day had left in a duffle bag on a couch. In the living room, Fentress and Tara said that they had stopped in the previous night "[b]ecause they was going to take care of the situation about the bad drugs" but that no one had been home. *Id*. at 55. Day believed that he, Fentress, Tara, and Ule were in the living room for ten to fifteen minutes. Day tried to calm Fentress and Tara down and "tried to talk to them and tell them there was other ways to handle it." *Id*. at 56. Fentress and Tara went into the bedroom in the back of the house, Rebecca woke up, and Fentress and Tara started to argue with Ralph and Rebecca. Rebecca heard "yelling and hollering" and "just kept remembering hearing the words hot shot." *Id*. at 11. A "hot shot" is "when you supposedly give somebody a shot of something that they believed to be one thing and really it's something that's supposed to kill them, or it's not what it's supposed to be and it[] hurts them in some sort of way." *Id*. Tara ended up on top of Rebecca and was choking her and the struggle lasted for thirty to forty-five seconds.

[4]   Fentress and Tara left the Thomases' house with Day and Ule. While driving to take Ule to the home at which she had been staying, Fentress and Tara "were arguing because [Fentress] didn't really want to take care of the situation the way that they was talking about" and Tara told Fentress that "he needed to handle the situation." *Id*. at 60. Day believed "that meant for [Fentress] to kill Becca and Ralph." *Id*. At some point, Tara exited the vehicle and Day believed she wanted out of the car because she was upset that Fentress did not handle the situation. Fentress continued on to drop Ule off, then took the same

route back, and picked up Tara near the area he had dropped her off. Fentress and Tara continued to argue about "[t]he same thing." *Id*. at 62.

[5] Fentress, Tara, and Day then returned to the Thomases' house. When they arrived, Fentress, Tara, and Day entered the house, and at the time Fentress had a revolver in his pants and Tara had Day's sawed-off shotgun. Fentress, Tara, Ralph, and Rebecca were "arguing about the situation" in the living room. *Id*. at 63. After a couple of minutes, Fentress told Tara to take Day out to the car. Rebecca walked to the bedroom, and Ralph and Fentress followed her. Fentress continued to argue with Ralph and Rebecca. At some point when Rebecca was sitting on the end of her bed and crying, she said "[Fentress] are you honestly telling me that I would ever do anything to try to kill you," *id*. at 21, or "you know I would never do that to you and I'd wouldn't have done it to Tara either," *id*. at 189-190, and Fentress walked out of the room. Fentress walked back into the room, fired a shot toward Ralph which missed, shot Rebecca in the face, turned back to Ralph and shot him in the head, and then shot Rebecca in the shoulder. Rebecca felt the bullet strike her in the jaw and her teeth hit her tongue and then passed out. Fentress ran out of the house, entered the car, and "told Tara not to ever tell him that he didn't love her. He just shot two people for her." *Id*. at 65. Rebecca regained consciousness and was not sure if she was dying, called 911, and reported that she and Ralph had been shot by Fentress. Ralph was transported to the hospital and later died.

[6] During a subsequent police interview, Fentress stated that Tara had overdosed during the prior September. He stated "[y]eah, walked back to the back

bedroom, and I woke them up and I said, hey you know guys we got a problem" and "if you think you're . . . going to steal my car, and you're going give me a hotshot too, that ain't going to happen." *Id.* at 181. He stated that, after they left the Thomases' house and before they returned to the house the second time, he argued with Tara and "said, oh yeah, well you don't think I love you, you don't think I'm protecting you, you don't think that I take up for you" and "said, alright then, you know, alright, watch this and I pulled in the driveway slammed on the brakes and ran in the house." *Id.* at 187. He stated, "I'm standing there screaming and I looked up and she's gone, the first thought was, I remember thinkin, these two done cost me, you know, now these two have caused us so many arguments." *Id.* Fentress stated that "I seen Tara . . . sittin in the car," that Rebecca "started saying . . . you know I would never do that to you and I'd wouldn't have done it to Tara either," and that "[t]he first thing I thought was why would you even say that . . . because . . . [t]he only person I ever said anything to was Tara that I thought that somebody tried to purposely kill her whenever she OD'd." *Id.* at 189-190. He stated that "I know Tara wasn't in that house whenever that happened, she already took off walkin in the road is what -- seeing her walking in the snow again, and just walkin away is when I snapped." *Id.* at 190.

[7] At one point in the interview, Fentress asked the officer who had called the police and told them what happened, the officer answered "Rebecca," Fentress responded "[a]re you lying or being serious," and the officer stated "I'm being honest with you. She called 911 with a bullet hole in the side of her face and a

shattered jaw to say that she had just been shot in the face and to say that her husband was laying there dying after being shot in the head." *Id*. at 224. Later during the interview, Fentress stated that Tara "took off walking because she said, you weren't going to do it anyway because you haven't done it already, as far as (inaudible)." Transcript Volume 4 at 9. Fentress stated that he thought one of his shots struck Rebecca, one struck Ralph, and one hit the wall. When asked to "[t]ell me what you do know," Fentress replied "[w]hen she walked away from me I cried like a baby," and when asked "[o]kay. What else do you know," Fentress answered "[b]ecause I hadn't shot them" and "[t]hat's what I was told." *Id*. at 14.

[8] On January 27, 2016, the State charged Fentress with: Count I, murder; and Count II, attempted murder, a level 1 felony. The State later alleged that Fentress was an habitual offender. At Fentress's jury trial, the court instructed the jury on the offenses of murder, attempted murder, voluntary manslaughter, and attempted voluntary manslaughter. The jury found Fentress guilty of murder and attempted murder as charged. The jury later found that Fentress was an habitual offender. The court sentenced Fentress to fifty-five years for his murder conviction, forty years for his attempted murder conviction, and ten years for his habitual offender adjudication, and it ordered that he serve the sentences consecutively for an aggregate sentence of 105 years.

## *Discussion*

### I.

[9] The first issue is whether the trial court committed fundamental error in instructing the jury. Fentress does not point to the record to show that he objected to the trial court's instructions for voluntary manslaughter and attempted voluntary manslaughter, and on appeal he claims the instructions resulted in fundamental error. Fentress has waived his challenge. *See Baker v. State*, 948 N.E.2d 1169, 1178 (Ind. 2011) (observing the defendant did not object to the trial court's instruction and accordingly waived any challenge to the instruction); Ind. Trial Rule 51(C) ("No party may claim as error the giving of an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.").

[10] We will review an issue that was waived at trial if we find fundamental error occurred. *Baker*, 948 N.E.2d at 1178. In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. *Id.* The error must be so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* In considering whether a claimed error denied the defendant a fair trial, we determine whether the resulting harm or potential for harm is substantial. *Id.* at 1178-1179. Harm is not shown by the fact that the defendant was ultimately convicted. *Id.* at 1179. Rather, harm is determined by whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Id.*

[11] Fentress asserts that, although he does not dispute that he shot Rebecca and Ralph, the court's instructions for voluntary manslaughter and attempted voluntary manslaughter resulted in fundamental error and were not harmless because, among other deficiencies, they informed the jury that it could find a defendant guilty of voluntary manslaughter only if it first found that the State did not prove the elements of murder whereas, properly instructed, a jury must consider a manslaughter charge only if it first finds a defendant guilty of murder. Fentress claims that there was more than enough evidence to justify the instructions, that he believed that Ralph and Rebecca had given Tara a "hot shot," that Rebecca said something during the argument which caused him to lose it, and that seeing Tara outside or walk away is when he "snapped." Appellant's Brief at 16.

[12] The State maintains that the evidence did not reveal a serious evidentiary dispute concerning whether Fentress acted in sudden heat when he shot Ralph and Rebecca and that any error regarding the voluntary manslaughter and attempted voluntary manslaughter instructions was harmless and did not constitute fundamental error. It argues that Fentress had ample time to reflect upon his actions before shooting the victims, had several months to think about his claim that Rebecca and Ralph tried to kill Tara, and had already confronted Rebecca and Ralph about the drugs in an earlier encounter.

[13] We find that Fentress was not entitled to instructions on voluntary manslaughter and attempted voluntary manslaughter and that the instructions, even assuming they were erroneous, do not serve as grounds for reversal. A

person commits murder when the person knowingly or intentionally kills another human being. Ind. Code § 35-42-1-1. A person commits voluntary manslaughter when the person knowingly or intentionally kills another human being "while acting under sudden heat." Ind. Code § 35-42-1-3(a). The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. Ind. Code § 35-42-1-3(b).

[14] "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005). Also, the existence of "sudden heat" can be negated by a showing that a sufficient "cooling off period" elapsed between the provocation and the homicide. *Morrison v. State*, 588 N.E.2d 527, 531-532 (Ind. Ct. App. 1992). Anger alone is not sufficient to support an instruction on sudden heat. *Suprenant v. State*, 925 N.E.2d 1280, 1282 (Ind. Ct. App. 2010) (citing *Wilson v. State*, 697 N.E.2d 466, 474 (Ind. 1998)), *trans. denied*. Nor will words alone "constitute sufficient provocation to warrant a jury instruction on voluntary manslaughter," and this is "especially true" when the words at issue "are not intentionally designed to provoke the defendant, such as fighting words." *Id*. (citing *Allen v. State*, 716 N.E.2d 449, 452 (Ind. 1999)).

[15] "In addition to the requirement of something more than 'mere words,' the provocation must be 'sufficient to obscure the reason of an ordinary man,' an objective as opposed to subjective standard." *Id*. at 1282-1283 (citing *Stevens v.*

*State*, 691 N.E.2d 412, 426 (Ind. 1997), *reh'g denied*, *cert. denied*, 525 U.S. 1021 (1998)). Finally, voluntary manslaughter involves an "impetus to kill" which arises "suddenly." *Id*. at 1283 (citing *Stevens*, 691 N.E.2d at 427).

[16] Voluntary manslaughter is an inherently included lesser offense of murder. *Washington v. State*, 808 N.E.2d 617, 625 (Ind. 2004). The only element distinguishing murder from voluntary manslaughter is "sudden heat," which is an evidentiary predicate that allows mitigation of a murder charge to voluntary manslaughter. *Id*. An instruction on voluntary manslaughter as a lesser included offense to a murder charge is warranted only if the evidence reflects a serious evidentiary dispute regarding the presence of sudden heat. *Isom v. State*, 31 N.E.3d 469, 486 (Ind. 2015), *reh'g denied*, *cert. denied*, 136 S. Ct. 1161 (2016).

[17] To the extent Fentress became angry or upset as a result of Tara walking away or indicating that he was not "going to do it anyway," or Rebecca stating that she would never try to kill him or Tara, we note that words, without more, do not provide sufficient provocation to support sudden heat. This is especially true when the words, as with Rebecca's statement, were not designed to provoke the defendant such as fighting words. *See Isom*, 31 N.E.3d at 486 (holding that, "even assuming Cassandra or the children said something to Isom that may have been provocative, '[w]ords alone are not sufficient provocation to reduce murder to manslaughter'") (citation omitted); *Suprenant*, 925 N.E.2d at 1282 (observing that words alone do not warrant a jury instruction on voluntary manslaughter and that this is especially true when the

words are not intentionally designed to provoke the defendant such as fighting words).

[18] Moreover, as for the suggestion that Rebecca's statement that she would never to try to kill Fentress or Tara constituted provocation, we observe that Tara overdosed months prior to the date of the shootings, that Fentress and Tara had stopped by the Thomases' house on January 12th but no one was home, and that a protracted argument on the day of the shootings including two separate visits to the Thomases' home culminated in Fentress shooting Ralph and Rebecca. Both Day and Rebecca testified regarding the arguing between Fentress and Tara and the Thomases and that they remembered Fentress or Tara referring to "hot shots" during their first visit on January 13, 2016. Day also indicated that, while traveling to drop off Ule, Fentress and Tara continued to argue, that Tara told Fentress that he needed "to handle the situation," and that he "believe[d] that meant for [Fentress] to kill Becca and Ralph." Transcript Volume 3 at 60. Fentress and Tara left the Thomases' residence for a period of sufficient length for Fentress to drop off Tara, take Ule home, pick up Tara, and to discuss the matter with Tara and Day. Day testified that Fentress should have had time to calm down. During their second visit to the Thomases' home on January 13th, Fentress carried a revolver and Tara carried a saw-off shotgun and, at some point, Tara exited the residence. Fentress stated during the police interview that Tara "took off walking because she said, you weren't going to do it anyway because you haven't done it already, as far as (inaudible)." Transcript Volume 4 at 9. Rebecca told Fentress that she would

never try to kill him or Tara. Fentress exited the room, walked back into the room, shot Rebecca in the face and shoulder and Ralph in the head, ran to the car, and told Tara that he had just shot two people for her.

[19] The evidence does not indicate that Fentress was provoked to a degree sufficient to prevent deliberation or reflection or that the impetus to kill arose in response to a contemporaneous event. The length of the extended argument on the day of the shooting including two separate visits to the Thomases' home, Fentress's interactions with Tara and Day, and Fentress's calculating shots all belie his claim of sudden heat. We conclude that there was no evidentiary dispute regarding whether Fentress committed the offenses of shooting Rebecca and Ralph while acting in sudden heat. *See Potts v. State*, 594 N.E.2d 438, 439 (Ind. 1992) (observing that the defendant had argued with one victim during the course of the evening, at one point the defendant and the victim entered an office and persons outside could hear loud voices as though they were arguing, that the defendant later exited the office and attempted to confront another victim, and that the defendant then drew a gun and shot the multiple victims, shooting one three times, another in the heart killing her, and another in the head killing him, and holding that there was no evidence that the defendant's disagreement with one of the victims resulted in anything but an exchange of words and that the defendant's cold and calculating firing of shots and the fact that he deliberately made every shot count belied his claim of sudden heat), *reh'g denied*, *cert. denied*, 507 U.S. 1039 (1993); *Suprenant*, 925 N.E.2d at 1284 (observing that the record was replete with evidence "that the impetus to kill did

not 'suddenly' arise in response to a contemporaneous event," that the couple had been arguing at length, and that, earlier on the day of the victim's death, the defendant had told his mother that the victim planned to leave and take the children, and holding that the defendant was not entitled to a voluntary manslaughter instruction).

[20] Accordingly, we find that Fentress was not entitled to instructions on voluntary manslaughter and attempted voluntary manslaughter and that the instructions do not serve as grounds for reversal of his convictions. *See Burris v. State*, 590 N.E.2d 576, 581 (Ind. Ct. App. 1992) ("Where there is no evidence of sudden heat, an incorrect instruction on voluntary manslaughter is not reversible error.") (citing *Hensley v. State*, 499 N.E.2d 1125, 1127 (Ind. 1986) (holding that there was no evidence of provocation or sudden heat and that the defendant "was not entitled to an instruction on attempted voluntary manslaughter and thus giving an incorrect definition of that offense cannot be a basis for reversal of the attempted murder conviction")), *trans. denied*; *see also Fleenor v. State*, 622 N.E.2d 140, 146 (Ind. 1993) (finding that the evidence did not support a voluntary manslaughter instruction and that the error in the court's voluntary manslaughter instruction was harmless), *cert. denied*, 513 U.S. 999 (1994), and *abrogated on other grounds by Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001).

## II.

[21] The next issue is whether the evidence is sufficient to sustain the finding that Fentress is an habitual offender. When an habitual offender finding is

challenged, we do not reweigh the evidence but rather look at the evidence in the light most favorable to the verdict. *White v. State*, 963 N.E.2d 511, 518 (Ind. 2012). If an appellate court deems the evidence insufficient, an habitual offender determination must be vacated. *Id.*

[22] Fentress asserts that one of the predicate felonies relied upon to find him to be an habitual offender was a class D felony in violation of Ind. Code § 35-50-2-8 and thus that the evidence does not support his habitual offender adjudication. The State responds that Fentress had a prior class C felony conviction, that thus at least one of his prior felonies was not a class D felony conviction, and that the State presented sufficient evidence that he was an habitual offender.

[23] Ind. Code § 35-50-2-8 provides in part:

> A person convicted of murder . . . is a habitual offender if the state proves beyond a reasonable doubt that:
>
> > (1) the person has been convicted of two (2) prior unrelated felonies; and
>
> > (2) at least one (1) of the prior unrelated felonies is not a Level 6 felony or a Class D felony.

[24] The State presented evidence that Fentress was convicted of burglary as a class C felony in 2002 and of possession of methamphetamine as a class D felony in 2012. Fentress does not challenge the determination that he was convicted of two prior unrelated felonies. One of the prior felonies upon which the State relied is Fentress's 2002 conviction for burglary as a class C felony; thus, at least one of the prior unrelated felonies is not a class D felony. We conclude that

Fentress's prior convictions support the determination that he was an habitual offender pursuant to Ind. Code § 35-50-2-8.

[25] While we affirm Fentress's convictions and habitual offender determination, we observe that the trial court erroneously entered a separate ten-year sentence for the habitual offender finding to be served consecutive to the sentences for murder and attempted murder. An habitual offender finding does not constitute a separate crime, nor does it result in a separate sentence. *See* Ind. Code § 35-50-2-8. Rather, an habitual offender finding results in a sentence enhancement imposed upon the conviction of a subsequent felony. *Hendrix v. State*, 759 N.E.2d 1045, 1048 (Ind. 2001). We remand with instructions that the trial court vacate the separate sentence on the habitual offender finding and attach the enhancement to either Fentress's sentence for murder or to his sentence for attempted murder and amend the sentencing order and abstract of judgment accordingly.

## Conclusion

[26] For the foregoing reasons, we affirm Fentress's convictions and habitual offender determination and remand.

[27] Affirmed and remanded.

Baker, J., and Riley, J., concur.