# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2019, 10:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bradley Keffer
Scott L. Barnhart
Brooke Smith
Keffer Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ryan Connors,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

April 30, 2019

Court of Appeals Case No.
18A-CR-2458

Appeal from the Vanderburgh
Superior Court

The Honorable Robert J. Pigman,
Judge

Trial Court Cause No.
82D03-1701-MR-183

**Brown, Judge.**

[1] Ryan Connors appeals his convictions for murder and attempted murder. He raises two issues which we revise and restate as:

> I. Whether the trial court abused its discretion in admitting certain evidence; and

> II. Whether the court abused its discretion in not instructing the jury as to the offenses of voluntary manslaughter and reckless homicide.

We affirm.

## Facts and Procedural History

[2] It is undisputed that Connors had a substance abuse issue. In January 2017, his grandmother met Avery Shoe at a Walmart in Illinois while Shoe was soliciting money for his church in North Carolina. Shoe told her about a church program for those with drug issues and gave her a flier which indicated the program's homes were free of charge and funded through donations. Connors's grandmother spoke to Connors's mother about the program, and she in turn spoke with him. According to Connors's mother, he initially did not wish to enter the program and she pressured him to do so. She called and spoke with Shoe the following day, and then Connors spoke with Shoe. At some point it was decided that Connors would join Shoe and other men and travel with them to North Carolina. Connors's mother drove him to his apartment so that he could pack and then to meet Shoe and his group, which included Henry Turner,

a member of the church for fourteen years, Pernell Robinson,[1] and two other men. Shoe, Turner, and their group traveled as a team to different cities to raise money, asked for donations and distributed flyers at different locations, and used the money to support the ministry and recovery homes. The group typically would not travel for longer than two weeks at a time. Shoe was the men's home director and was in charge of the team and the finances during the trip. According to Turner, the group deposited the donations it received into a bank account, Shoe usually held the money in a Bank of America bag until it could be deposited, and on occasion the money would be sent to the church as a money order.

[3] Turner filled out an intake form for Connors dated January 5, 2017, and Connors signed the form.[2] The program's rules provided that smoking and drugs were prohibited, participants would have no communication with family for the first thirty days except at church, and there would be an inspection of all property when entering the home. According to Turner, Connors's bag was searched which was standard practice and Shoe would have confiscated any cell phone or medicine such as hydrocodone. Turner stayed with the group in a motel room that night.

---

[1] Turner testified that Robinson had a disability, did not understand everything, and needed extra care.

[2] The intake form indicated a name of Ryan K. Moore, included a social security number which had one digit which was different than Connors's social security number, and indicated that he was not prescribed any medications by a doctor.

[4] During the day on January 6, 2017, Shoe, Turner, Robinson, and Connors raised funds at a Walmart in Evansville, Indiana, and the other men raised funds at another location. At some point, Connors said that he needed to take pain pills, and Shoe told him that he could not have them unless he had a doctor's order. According to Turner, Connors "probably got a little angry" but then, when riding in the van to a motel, it "[s]eemed like everything had died down, the argument that they had, it had died down." Transcript Volume 2 at 79-80. The group arrived at a Motel 6 in Evansville, and Shoe went inside to rent a room. He then went into the room, and Turner, Robinson, and Connors waited in the van for him to call Turner to let them know they could all come into the room.[3] Connors told Turner that he needed to use the restroom, and Turner told him that he needed to wait for Shoe's call. Connors wanted to urinate outside, and Turner pointed out there were cameras. After several minutes,[4] Shoe called Turner and said that the men could enter the motel room. Connors "burst out the van" and went directly and quickly into the room. *Id.* at 51. Turner got his luggage, helped Robinson with his luggage, and then walked toward the motel room.

---

[3] When asked "[w]as it [Shoe's] standard practice to hide the money when he went into the hotel room alone," Turner testified "[w]ell he usually just, you know, put it away but sometime we had a safe in the room, sometime, but I don't think we had a safe that time so usually he'd just either hide the money I guess, put it under his mattress or whatever." Transcript Volume 2 at 90.

[4] When asked "[h]ow long was [Shoe] in the hotel room by himself before you let [Connors] go in," Turner replied "[c]ould have been five minutes, could have been longer." Transcript Volume 2 at 90.

[5] Turner walked into the room and observed that "there was blood everywhere, all on the walls," saw that "the bed had been moved around like there was a scuffle," and saw Shoe standing up. *Id*. at 51-52. Connors "slammed the door shut" and struck Turner in the back of the head with a sharp, shiny object which appeared to Turner to be a piece of metal. *Id*. at 52. Connors then stabbed Turner in the chest, Turner fell against the wall, and Connors kicked Turner in the face. Turner saw Shoe on the floor with his eyes open and believed he was dead. Turner yelled for Robinson, who was sitting on the bed, to obtain help, but he remained on the bed. Turner remained on the floor and pretended to be dead, and Connors grabbed Shoe's backpack, grabbed Robinson and told him "come on," and then ran out of the room. *Id*. at 53. Turner called 911 and was hospitalized and left with scars on his head, neck, and chin. Shoe died as a result of his injuries and sustained five sharp force trauma wounds, including one involving the deep musculature of the right shoulder and right upper chest, one in his chest which pierced his pericardium, and one to his lower abdomen and "his insides were on the ground." *Id*. at 95.

[6] Police determined Connors's location at a Knights Inn in Lexington, Kentucky, by locating his cell phone. The police found him sitting in a chair in the motel's lobby and discovered a black bag beneath his chair. The police took him into custody and transported him to a hospital due to a laceration on his hand. The bag found under the chair contained the Bank of America bag of money.

[7] On January 10, 2017, the State charged Connors with Count I, murder; Count II, attempted murder as a level 1 felony; Count III, kidnapping as a level 2

felony; Count IV, criminal confinement as a level 2 felony; and Count V, robbery of Turner resulting in serious bodily injury as a level 2 felony. The State later amended Count V to allege that Connors took property from Turner and/or Shoe as a level 2 felony. Connors filed a request for instructions on the offenses of voluntary manslaughter and reckless homicide. During the jury trial, over Connors's objection, the court admitted testimony from Detective Phillip Luecke that the scene at the Motel 6 "was absolutely the most gruesome crime scene [he had] ever experienced." *Id.* at 142. The court also admitted, over Connors's objection, a copy of the charging information under Count V. The State dismissed Counts III and IV. The court noted that Connors had tendered instructions for voluntary manslaughter and reckless homicide, found there was no evidence of sudden heat or evidence of provocation, found no serious evidentiary dispute as to whether the killing was murder or reckless homicide, and declined to give the proposed instructions. The jury found Connor guilty of murder under Count I, attempted murder under Count II, and robbery resulting in serious bodily injury under Count V. The court vacated Count V and sentenced him to fifty-five years for murder under Count I and thirty years for attempted murder under Count II to be served consecutively.

*Discussion*

I.

[8] The first issue is whether the trial court abused its discretion in admitting certain evidence. The admission and exclusion of evidence is a matter within the sound discretion of the trial court. *Wilson v. State*, 765 N.E.2d 1265, 1272

(Ind. 2002). An abuse of discretion occurs where the trial court's ruling is clearly against the logic, facts, and circumstances presented. *Oatts v. State*, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). Errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015). To determine whether an error in the introduction of evidence affected the party's substantial rights, we assess the probable impact of that evidence upon the jury. *Id.*

[9]     Connors claims the court improperly admitted Detective Luecke's testimony that the crime scene was the most gruesome he had experienced and the charging information under Count V. The State called Detective Luecke and questioned him about his employment and duties as a crime scene detective and his investigation of the scene at the Motel 6. He testified he had been employed by the Evansville Police Department for twenty years and had been a crime scene detective for a little over four years. He testified regarding blood patterns and the swabs he collected. When asked how many crime scenes he had processed in his career, Detective Lueke replied: "Hundreds . . . I did eight [murders] last year I believe. This year I've done three murders. I've done auto accidents, fatalities, but I mean we get called out two or three times a night for maybe something small, maybe something big so . . ." Transcript Volume 2 at 142. When asked "in your experience how does the Motel 6 scene that you observed on January 6th of 2017 compare to other scenes you've seen," Connors's counsel objected based on relevance, the court overruled the

objection, and Detective Lueke responded: "It was absolutely the most gruesome crime scene I've ever experienced." *Id*.

[10] Connors argues on appeal that the challenged testimony was not relevant and was prejudicial by seeking to inflame the jury. The State responds that the detective's statement supports the argument that the wounds caused by Connors were severe and of the type that reflect an intent to kill or knowledge that death was highly probable and that the nature of the scene provided a sense of the magnitude of the victim's injuries.

[11] The State presented numerous photographs depicting the scene at the Motel 6 and extensive testimony regarding the crime scene and the photographs. The jury heard testimony from Turner regarding his observations of the blood on the walls and Connors's attack on him using a sharp object. The State presented evidence of the extensive injuries inflicted upon Shoe and Turner and the appearance of the scene of the attack. Based upon the record and in light of all of the evidence before the jury, we cannot say the challenged testimony was likely to have had a significant impact upon the jury or affected Connors's substantial rights.

[12] As for the charging information under Count V, the prosecutor stated "Your Honor, at this time the State would move to admit State's Exhibit 30 into evidence which is a certified copy of part of the charging Information in this case, the Amended Count 5, primarily to prove the Defendant's date of birth and social security number." Transcript Volume 3 at 18. The prosecutor later

argued, "with regard to the Defendant's date of birth and social security number on the Defendant's intake sheet that's already been admitted into evidence, he indicated that his name was Ryan Moore instead of Ryan Connors," "[h]e gave his correct date of birth and the social security number that he gave was mostly correct with the exception of one digit which was one digit off," "I intend to use that to show intent," and "[h]is identification card which has been admitted into evidence has his date of birth and name on it. However there's been nothing else to be introduced that would have his social security number on it." *Id*. at 19. Connors's counsel objected and argued "I think that a certified piece of, you know, a Court document is certainly going to be very prejudicial to, to Ryan," "it paints him as a criminal," "[y]ou have a criminal document you're submitting before a jury and then telling them to go deliberate on the ultimate issue," "I would also note that Henry Turner's testimony was that Henry Turner is the one that filled that out, not Mr. Connors so I don't think it is then fair to insert this and try to suggest that it was Mr. Connors that filled that out and deliberately put in the wrong information especially if it was only off by, by one digit." *Id*. at 19-20. The court admitted the information. In closing argument, the prosecutor referred to the information, noted it contained Connors's name, birth date, and social security number, and argued "his social security number you'll notice ends in 0954 and what did he put on the intake sheet? 0944." *Id*. at 71.

[13] Connors argues on appeal that the admission of the charging information was highly prejudicial as it asserted in a formal court document that he was a

criminal. The State responds that the information did not provide any substantial information which the jury had not already heard, except for Connors's correct identifying information, and there is little danger the information inflamed the passions of the jury.

[14] The record reveals that the challenged exhibit contained the charging information alleging robbery under Count V and that the trial court did not enter judgment of conviction on Count V. The trial court read the substance of the allegations in Count V in its preliminary instructions to the jury, evidence was presented that Connors took the money in the Bank of America bag, and the prosecutor in opening and closing argument discussed the allegations of robbery. We cannot say, in light of the record as a whole, that the admission of the charging information was likely to have had a significant impact upon the jury or affected Connors's substantial rights.

## II.

[15] The next issue is whether the trial court abused its discretion in not giving instructions on voluntary manslaughter and reckless homicide. Connors asserts there was evidence of sudden heat sufficient to allow the jury to find that he committed voluntary manslaughter. He argues that he was abruptly handed off to a religious group that he initially did not want to join and was required to travel with individuals who searched his belongings, to solicit funds, and to follow certain rules. He argues that a reasonable jury could infer that he was upset about being given away to Shoe who made him wait to enter the motel

room and use the bathroom. He also argues that it can be inferred there was a scuffle and the only organ that was severely impacted was Shoe's heart and asserts that, in light of the absence of evidence surrounding his interaction with Shoe, there is a serious dispute concerning his intent and whether he acted intentionally or recklessly.

[16] The State maintains, with respect to the proposed voluntary manslaughter instruction, that while Connors cites to a series of aggravating experiences, none of them were sudden and all of them were followed by a period of cool reflection. It argues that he was dropped off and had his cell phone seized and his bags searched one to one and one-half days before he killed Shoe, and that, while he was initially angry about being denied hydrocodone, Connors calmed down after Shoe said that he would only be able to take it with a doctor's orders. It contends there is no record of him experiencing the level of anger, rage, resentment, or terror that would cause an ordinary person to be incapable of deliberation, premeditation, or cool reflection. As for the proposed reckless homicide instruction, the State maintains that Connors attacked in such a way that demonstrated an intent to kill or knowledge that death was highly probable and that Shoe's many significant wounds and Connors's subsequent actions also show his intent.

[17] We apply a three-step analysis in determining whether a defendant was entitled to an instruction on a lesser-included offense. *See Wright v. State*, 658 N.E.2d 563, 566-567 (Ind. 1995). We must determine: whether the lesser-included offense is inherently included in the crime charged; if not, whether the lesser-

included offense is factually included in the crime charged; and if either, whether there is a serious evidentiary dispute whereby the jury could conclude the lesser offense was committed but not the greater offense. *Id.* If a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. *Id.* at 567. When the trial court makes a finding that a serious evidentiary dispute does not exist, we will review that finding for an abuse of discretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998).

[18]     A person commits murder when the person knowingly or intentionally kills another human being. Ind. Code § 35-42-1-1. A person commits voluntary manslaughter when he knowingly or intentionally kills another human being "while acting under sudden heat." Ind. Code § 35-42-1-3(a). The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder to voluntary manslaughter. Ind. Code § 35-42-1-3(b). "Sudden heat occurs when a defendant is provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection." *Conner v. State*, 829 N.E.2d 21, 24 (Ind. 2005). "[N]either mere words nor anger, without more, provide sufficient provocation." *Id.* Also, sudden heat can be negated by a showing that a sufficient "cooling off period" elapsed between the provocation and the homicide. *Morrison v. State*, 588 N.E.2d 527, 531-532 (Ind.

Ct. App. 1992). Voluntary manslaughter is inherently included in murder. *Horan v. State*, 682 N.E.2d 502, 507 (Ind. 1997), *reh'g denied*.

[19] The evidence reveals that Connors joined Shoe, Turner, and the other men on January 5, 2017, at which time he signed an intake form, his bags were searched, and any cell phone or drug such as hydrocodone would have been confiscated. He spent the night with the group and was with them all day as they raised money on January 6, 2017. Shoe told him at one point that ordinarily he could not have pain pills unless he had a doctor's order, and Connors "probably got a little angry," but it "[s]eemed like everything had died down, the argument that they had, it had died down." Transcript Volume 2 at 79-80. Connors said that he needed to use the restroom, Turner told Connors that he needed to wait for Shoe's call, and Turner testified that five or more minutes could have passed before he received Shoe's call. To the extent the evidence shows that Connors was angry with Shoe or Turner, we note that anger without more does not provide sufficient provocation. *See Conner*, 829 N.E.2d at 24. Moreover, Connors does not point to any actions of Shoe or Turner which could constitute provocation to a degree sufficient to render him incapable of reflection. Based upon the record, we conclude that there was no serious evidentiary dispute regarding whether Connors committed the offense causing the death of Shoe or committed the attempted offense against Turner while acting in sudden heat. The trial court did not abuse its discretion in declining to give Connors's proposed instruction on voluntary manslaughter. *See Collins v. State*, 873 N.E.2d 149, 159-160 (Ind. Ct. App. 2007) (holding that

anger alone is not sufficient to support an instruction on sudden heat), *trans. denied*.

[20] Reckless homicide is an inherently included lesser offense of murder, as the only element distinguishing the two is the requisite culpability. *See Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); *Miller v. State*, 720 N.E.2d 696, 702 (Ind. 1999). A person engages in conduct "'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so," whereas a person engages in conduct "'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." *See* Ind. Code § 35-41-2-2.

[21] The evidence establishes that Connors engaged in a vicious and prolonged attack upon Shoe and then upon Turner. Connors caused five sharp force trauma injuries to Shoe which included significant stab and incisional wounds. When Turner entered the room, Connors slammed the door shut and attacked, stabbed, and kicked him, ending the attack after Turner pretended to be dead. There is no evidence that Connors swung the sharp object at random. The court did not abuse its discretion in declining to give the proposed instruction on reckless homicide. *See Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001) (holding there was no serious evidentiary dispute to support giving an instruction for reckless homicide where the defendant struck the victim in the head twice with a concrete block); *Lyttle v. State*, 709 N.E.2d 1, 3 (Ind. 1999) (holding the trial court did not abuse its discretion by denying a requested

reckless homicide instruction where the defendant struck the victim in the head several times with a baseball bat); *Sanders v. State*, 704 N.E.2d 119, 122 (Ind. 1999) (holding "[t]here is no evidence that [the defendant] was shooting at the crowd on the stairs at random; rather, he shot only at" the victim and the defendant was not entitled to an instruction on reckless homicide); *McDowell v. State*, 102 N.E.3d 924, 933 (Ind. Ct. App. 2018) (noting that, in certain cases, "there was a relatively brief act that resulted in the victim's death (shooting a gun that might have been loaded, playing around with a handgun, striking a small child with a paddle, squeezing a small child's neck during play)" and that these actions could have been performed recklessly, but that "[i]n contrast, the evidence here shows that [the victim] was subject to an extensive beating, not a momentary action, such that there is no way that [the defendant] could have acted merely recklessly without also acting knowingly"), *trans. denied*. The trial court did not abuse its discretion in refusing Connors's proposed instructions.

[22]  For the foregoing reasons, we affirm Connors's convictions for murder and attempted murder.

[23]  Affirmed.

May, J., and Mathias, J., concur.